IN THE

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF COLUMBIA

RECEIVED

NOV 1 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CHARLES E. FORRESTER, JR.,
     Plaintiff,

v.                                    Civil No. 06-1954(HHK)

BUREAU OF PRISONS, et al.,
     Defendants.


## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## THE DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS


Comes now the Plaintiff, Charles E. Forrester, Jr., pro se, and hereby respectfully requests this Court to deny the Defendants' supplemental motion to dismiss Plaintiff's remaining claims. In support of Plaintiff's opposition, Plaintiff asserts the following:


### ARGUMENT

1. **Rivers Correctional Institution does not offer Plaintiff any viable marketable vocational opportunities.**


Plaintiff has maintained throughout this entire civil action that currently, Rivers Correctional Institution ("RCI") and the Bureau of Prisons ("BOP") do not provide Plaintiff with any viable

- 1 -

marketable educational opportunities. See Plaintiff's complaint at paragrsaphs 25-33. In addition, see Plaintiff's Response In Opposition to Defendants' Motion to Dismiss at pages 1-2 in conjunction with Plaintiff's sur-reply memorandum at pages 1-3.

On September 12, 2007, this Court ordered the Defendants to address "whether Plaintiff is being deprived of any educational or vocational training programs at RCI in violation of 28 C.F.R. § 541.12(10)...". See id. The Defendants have not satisfied the or-der of the Court, and they are currently in violation of the Con-gressional mandate set forth in D.C. Code § 24-101(b) (2001). In addition, the Defendants are currently depriving Plaintiff of his "right" to participate in "vocational training", thus blocking Plaintiff's "interests" in acquiring marketable vocational training. See 28 C.F.R. § 541.12(10), and Plaintiff's complaint at paragraph 27. On page 2 of the Defendants' supplemental Memorandum, they set forth a list of various programs that RCI offers to the inmate popu-lation. The Defendants are suggesting that those programs consist of both "marketable training and educational opportunities". See id. The programs noted by the Defendants can hardly be considered marketable vocational programs.

It is extremely important for this Court to note that if RCI actually offered Plaintiff any marketable programs, then RCI's staff would not have moved the BOP to transfer Plaintiff to a BOP facility

for programs participation.  See Exhibit one, 03-24-06 Request for Transfer.  See also Plaintiff's Complaint at paragraphs 25-26.

The Court is hereby apprised that the absence of viable marketable vocational opportunities at RCI has become so serious that the Honorable Congresswoman Eleanor Holmes Norton has intervened in the matter.  See Exhibit two, 10-17-07 Washington Post article. In addition to that, Plaintiff attaches three statements and one testimonial that were provided during the  course of the Congressional hearings of October 16, 2007—hearings that were held with respect to the lack of rehabilitative services at RCI.  Plaintiff attaches the statement of Chairman Danny K. Davis, the testimony of Warden George E. Snyder, the statement of Paul A. Quander, Jr. (director of Court Services and Offenders Supervision Agency), and the statement of Harley G. Lappin (director of the BOP).  In conjunction with Title 28 U.S.C. § 201, Plaintiff hereby respectfully moves this Court to take judicial notice of the Washington Post article, along with the attached statements and testimonies.  Covad Comms. Co. v. Bell Atlantic Corp., 407 F.3d 1220, 1222 (D.C.Cir. 2005) (permitting judicial notice of facts in public records of other proceedings); U.S. ex rel Dingle v. Bioport, 270 F.Supp.2d 968, 972 (W.D.Mich. 2003); Adarand Constructions Inc. v. Slater, 228 F.3d 1147, 1168-69, and n.12 (10th Cir. 2000).

Subsequent to Congresswoman Norton's August 2007 visit to RCI, a congressional hearing was convened on October 16, 2007, regarding

the rehabilitative services at RCI.  See Exhibit three, statement of Chairman Danny K. Davis.  During the hearing, RCI's warden, George E. Snyder, testified truthfully, referencing the bare minimum (ostensibly "vocational") programming offered at RCI.  See Exhibit four, pages 7-8.  See also, the Defendants' supplemental memo at page 2, paragraph 2.  The Defendants attach to their memo an unsworn declaration of Thomas Christensen.  In paragraph 3 of that declaration, Christensen states that, "[i]nmates  are informed of the vocational programs available to them through their Inmate Handbook (Rivers Handbook, pgs 22-23)."  See id.  The Court should note that RCI's handbook is absolutely silent with respect to the "vocational programs" available to RCI inmates.  Paragraph 3 of the Christensen declaration is dangerously close to perjury, and it is a very bizarre attempt to pull the wool over the Court's eyes.  See 28 U.S.C. § 1746. The Court is requested to note the inconsistency in the Christensen declaration.

Subsequent to Warden Snyder's testimony before the subcommittee, the BOP's director, Harley G. Lappin, also provided statements to the subcommittee regarding the programs at RCI.  See Exhibit five, statement of Harley G. Lappin.  On pages 4-6 of the director's statement, he gives the subcommittee an overview of the BOP's mission regarding inmate programs, etc.  See id.  Cf. Plaintiff's complaint at paragraph 27.  The BOP's director notes, however, that:

> "D.C. inmates confined in the Rivers Correctional

> Institution are offered the opportunity to par-
> ticipate in programs; however, we now believe that
> the **vocational training** and residential drug
> abuse treatment programs **are inadequate**.  We have
> identified a need to expand vocational training
> programs...".

Id. at page **7**.  On page **2** of the Defendants' supplemental memo, they

claim that both "marketable training and educational opportunities

are available to Rivers inmates".  The educational would-be market-

able training opportunities are listed as: Adult Basic Education,

General Equivalent [sic] Diploma, Life Skills, Keyboarding, Compu-

ter Technology I and II, Woodworking, Workforce  Transition, Cor-

rections Learning Network, and Wheels for the World Program.  See

id.  See also Exhibit four, pages **7-8**, Warden Snyder's synopsis of

RCI's various programs.  Unequivocally, the BOP's director stated

to Congress members that those programs offered to the RCI inmates

are **inadequate**.  See Exhibit five at page **7**.  During the month of

December 2006, the BOP requested that the GEO Group, Inc., submit

proposals to increase programming at RCI.  The GEO Group submitted

three proposals to the BOP, which consisted of: 1) Carpentry VT pro-

gram, 2) Plumbing, and 3) an electrical VT program.  See id. at

pages **7-8**.


Without doubt, the Defendants' representation to this Court

is a clear contravention of justice (not to mention a curious dis-

respect for both the legislative and judicial branches of this go-

vernment); they have argued one thing to this United States District

Court (that Plaintiff's claim of inadequate marketable vocational opportunities should be dismissed) and they have argued the opposite in their testimony to Congress (that the vocational training programming at RCI is inadequate)!

Paul A. Quander, Jr., Director of the Court Services and Offender Supervision Agency for the District of Columbia ("CSOSA"), provided a statement to the subcommittee of October 16, 2007. See Exhibit Six, Statement of Paul A. Quander, Jr. On page **6** of the director's statement, he asserts that:

> "CSOSA has been working with the GEO Group and the BOP to develop programs that provide the skills needed in the D.C. job market and to link these programs with local employers and trade unions...At this time, we are working with the Carpenters Union to develop a union-approved carpentry training program ...**We hope this program will be the FIRST of multiple successful efforts to bring vocational training to Rivers**."

See id at page **6** [emphasis added]. The statement of Mr. Quander corroborates Plaintiff's complaint that currently, RCI **does not** have any viable marketable vocational opportunities available to him. See Plaintiff's complaint at paragraphs **25-28**. The Defendants are currently depriving Plaintiff of his "right" to participate in vocational training; he is being deprived of his "interest" in acquiring marketable vocational programs; and he is being barred from undertaking his "responsibility" to take advantage of

- 6 -

such programs, all in violation of 28 C.F.R. § 541.12(10) (Inmate rights and responsibilities). "'It is a well-settled rule that an agency's failure to follow its own regulation is fatal to the deviant action'." Mine Reclamation Corp. v. F.E.R.C., 30 F.3d 1519, 1524 (D.C. Cir 1994) (quoting respectively Way of Life Television Network, Inc., v. Federal Communications Commission, 593 F.2d 1356, 1359 (D.C. Cir. 1979); and Union of Concerned Scientists v. Atomic Energy Commission, 499 F.2d 1069, 1082 (D.C. Cir. 1974)). In accordance with 28 C.F.R. § 541.12(10), the Court is requested to compel the Defendants to provide Plaintiff with at least one marketable program opportunity without further delay, thus providing Plaintiff with the "right to participate in...vocational training". Leis v. Flynt, 439 U.S. 438, 442 (1979) ("A claim of entitlement..., to be enforceable, must be derived from statute or legal rule or through a mutually explicit understanding").

2. **The BOP is currently violating Plaintiff's right to participate in marketable vocational training.**

Currently, the BOP **does not** make any allowance for, provide for, or sponsor any vocational programming at Rivers Correctional Institution, notwithstanding the fact that Congress explicitly charged the BOP with the responsibility of Plaintiff's "education" and "training". D.C. Code § 24-101 (2001). In fact, the relevant portion of the statute expressly provides, in part, that:

- 7 -

"...the Bureau of Prisons **shall be responsible** for the custody, care, subsistence, **education**, treatment, and **training** of [Plaintiff]."

D.C. Code § 24-101(b) [emphasis added]. In the Defendants' April 12, 2007 Reply in Support of Motion To Dismiss, they acknowledge that "[i]t is true that D.C. Code § 24-101(b) does grant the BOP authority to oversee D.C. Code felons and part of this oversight includes the provision of education and training opportunities [... and...] the statute merely outlines the fact that training and educational opportunities are to be made available to inmates." See the Defendants' April 12, 2006 Reply In Support of Motion To Dismiss at pages **3** and **4**. (The Defendants fail to understand that the mandate of § 24-101 does not mean that at least on a single occasion the BOP should feed, treat, educate, and train D.C. felons; it is a continuous duty of the BOP to feed, treat, educate, and train D.C. felons. To interpret the statute as requiring one-time compliance——Defendants appear to complain that "plaintiff has already taken classes"——is a stretch of logic and the imagination. But even further, Defendants appear to be arguing that since the statute is a "mere[] outline[]", no compliance whatsoever is needed!!)

The Court is requested to note that the Defendants have utterly failed to provide this Court with any evidence to suggest that the **BOP** does in fact provide or sponsor any marketable vocational opportunities at RCI. See **chiefly**, 28 C.F.R. § 544.50 ("Each Bureau of Prisons institution provides occupational education programs which

- 8 -

allow interested inmates the opportunity to obtain marketable skills")
and BOP program statement 5300.18. See also Plaintiff's complaint
at paragraphs 25 and 27.

At the Congressional hearings on October 16, 2007, the director
of the BOP confirmed that the BOP does not have any viable marketable
vocational opportunities available to Plaintiff. See Exhibit five,
pages 4-8. Cf. Exhibit Six, pages 5-6. Because the BOP does not have
any vocational programs available to Plaintiff at RCI, the BOP is in
violation of the Congressional mandate set forth at D.C. Code § 24-
101(b). In addition, the BOP is currently violating Plaintiff's
"right" to participate in "vocational training", as prescribed in
28 C.F.R. § 541.12(10).

On March 7, 2000, the BOP entered into a contractual agreement
with Wackenhut Corporation (no GEO Group, Inc.) to house D.C. Code
felons. See Exhibit seven, 3-7-2000 contract award page. See also
Exhibit five, pages 3-4 of that contract. Although the contract
has a provision captioned as "Academic and Vocational Education",
the contract is completely silent with respect to vocational pro-
grams. See Exhibit Seven, pages 37 and 38. Apparently, RCI is not
even required to have any vocational programs at all, which runs
counter to the Congressional mandate set forth at D.C. Code § 24-
101(b). The BOP "cannot absolve themselves of their duties to Dis-
trict prisoners simply by contracting for the services of a third

- 9 -

party." <u>Jackson v. District of Columbia</u>, 89 F.Supp.2d 48, 52 (D.D.C. 2000). After all, where D.C. law states that "...the Bureau of Prisons shall be responsible for the...education...and training of such persons [i.e. D.C. felons", the very next sentence of that statute mandates that the BOP "shall house [those persons] in private contract facilities". At no point does D.C. Code § 24-101 even remotely suggest that the outsourcing of housing negates the BOP's six key responsibilities—each of which carries equal statutory weight under § 24-101: "custody, care, subsistence, education, treatment, and training".

On page <u>2</u> of the Defendants' Supplemental memo, they outline the <u>RCI</u> programs that Plaintiff participated in. Then the Defendants claim that those programs should be viewed as "marketable". <u>See id</u>. First of all, whether or not the Life Skills is "marketable" is out of the question; RCI staff acknowledge that it is not and do not grant credit for it. The Computer Technology program (a how-to-type class) and the Commercial Driver Prep course (no longer offered at RCI) are arguably marketable; but again, there is no issue as to whether Plaintiff ever took a class before (see Plaintiff's original complaint at paragraphs <u>21-22</u>)—the issue at hand is <u>are there any classes available to Plaintiff here and now</u> ("here" being at RCI, "now" being as of the date of this filing, and through the present)? The answer remains "no". And although Plaintiff was incarcerated AT Rivers when he took the two "Adult Continuing Educa-

tion Correspondence" courses, RCI played absolutely no role in the courses. See Exhibit Eight, Inmate Education Data. Plaintiff researched and applied for the two courses on his own, and paid for them on his own, and completed them on his own, all without any input or guidance or support from RCI staff and without the use of any RCI tools or equipment or space. See Exhibit nine, Forrester's affidavit. Neither RCI nor the BOP had anything to do with Plaintiff's completion of the correspondence programs.

On page 2 of the Defendants' Supplemental motion, they claim that "...the education staff can assist inmates in obtaining funding for college-level or correspondence work." See id. At best, the RCI staff will only provide an inmate with a listing of organizations that might assist non-incarcerated individuals with funding for college-level or correspondence courses. Subsequent to Plaintiff requesting assistance from RCI's education department, and being informed that RCI does not in fact provide any such assistance ("in obtaining funding for college-level or correspondence work"), Plaintiff was left with no other alternative but to pay for his own correspondence courses. See Exhibit Nine, paragraph 4-5.

Finally, Defendants' statement, on page 2 of their Supplemental Memo—that "Plaintiff's own acknowledgement that he has participated in several Rivers programs since his incarceration defeats his claim that he has no viable opportunities"—does not logically connect to anything that the Plaintiff has ever said.

- 11 -

See specifically paragraphs 21-25 of Plaintiff's complaint. In summation: Plaintiff has been incarcerated since April 1993 (but at RCI only since September 2002); "[t]hrough Plaintiff's incarceration, he has acquired a magnitude of program achievements; as a consequence of those achievements, the duration of Plaintiff's sentence structure has been substantially reduced pursuant to D.C. Code § 24-221.01(a) (Education good time)"; and "subsequent to Plaintiff's arrival to RCI, he has completed virtually every educational and/or vocational program that RCI has to offer". And after Plaintiff was denied admission to the two remaining classes at RCI—and given that Plaintiff will remain incarcerated until 2011—"RCI staff moved the BOP to transfer Plaintiff to a BOP facility for 'Programs Participation'" (see Exhibit one, Request For Transfer).

Throughout this entire civil action, the Defendants have failed to produce any evidence to this Court that would suggest that they are not depriving Plaintiff of any marketable vocational training in violation of 28 C.F.R. § 541.12(10). See Plaintiff's complaint at paragraphs 25-28. See also the Court's Order of September 12, 2007. The fact that Plaintiff is currently doing idle time at RCI, and that there are no more educational opportunities for him at RCI, begs an answer for the question "What is Plaintiff supposed to do in terms of vocational training from now until 2011?" See chiefly D.C. Code § 24-101(b) and 28 C.F.R. § 541.12(10). See also Exhibit two, Washington Post article of October 17, 2007.

- 12 -

## CONCLUSION

Accordingly, Plaintiff has stated a claim upon which relief can be granted; thus, the Court is hereby respectfully requested to deny the Defendants' request to dismiss Plaintiff's remaining claim.

## REQUEST FOR HEARING

Plaintiff respectfully requests a hearing on the Defendants' Supplemental Motion To Dismiss. In addition, Plaintiff is requesting a hearing to develop a record regarding a time frame insofar as when the BOP's director will institute programs that "mirror as close as we can the programs offered in other prisons". See chiefly, Exhibit two, paragraph 2, and Exhibit five, pages 4-8, in comparison with BOP program statement 5300.18 et seq. The Court is also respectfully requested to exercise its discretion in granting Plaintiff any relief that the Court deems appropriate and just.

November 13, 2007

Respectfully submitted,

/s/ _Charles E. Forrester, Jr._

Charles E. Forrester, Jr.
Fed. Reg. No. 09565-007
Rivers Correctional Institution
P.O.Box 630
Winton  NC  27986-0630

- 13 -

## CERTIFICATE OF SERVICE

This is to certify that I have this 14th day of November 2007 served a copy of the foregoing upon the below-listed party by placing the same in the Rivers Correctional Institution prison mailbox, addressed as follows:

> Blanche L. Bruce
> Assistant United States Attorney
> 555 Fourth Street, N.W.
> Room E-4220
> Washington  DC  20530

/s/ _____
Charles E. Forrester, Jr.
pro se

- 14 -

EMS-409.051 **REQUEST FOR TRANSFER/APPLICATION OF MANAGEMENT VARIABLE** CDFRM
DEC 99
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| FROM: GEORGE E. SNYDER, WARDEN | FACILITY: RIVERS CORRECTIONAL INSTITUTION (RCI) | DATE: 03-24-2006 |
|---|---|---|
| INMATE'S NAME: FORRESTER, CHARLES | REGISTER NO.: 09565-007 | |
| TO: KIM WHITE, REGIONAL DIRECTOR | ATTN:  REGIONAL DESIGNATOR | |

__XXX__ TRANSFER TO: FCC COPELAND, COLEMAN, FLORIDA  PROGRAMS PARTICIPATION (324)

____ APPLY MANAGEMENT VARIABLE(S)_____

____ UPDATE MANAGEMENT VARIABLE EXPIRATION DATE.  (NEW DATE): _____

1.  INMATE'S MEDICAL STATUS: CLEARED FOR REGULAR DUTY WITH THE MEDICAL RESTRICTION OF SPECIAL DIET.

2.  INSTITUTION ADJUSTMENT (INCLUDE A BRIEF DESCRIPTION OF THE INMATE'S ADJUSTMENT DURING THIS PERIOD OF INCARCERATION WITH EMPHASIS ON RECENT ADJUSTMENT.):  N/A

DISCIPLINARY RECORD

| 3. DATE | CODE/OFFENSE | UDC/DHO DISPOSITION |
|---|---|---|
| N/A | N/A | N/A |

4.  RATIONALE FOR REFERRAL.  (FOR MARIEL CUBAN DETAINEES, INCLUDE AVAILABILITY OF COMMUNITY RESOURCES AND STATUS OF INS REVIEW PROCESS IN THIS SECTION.):

INMATE FORRESTER ARRIVED AT RCI ON 09-12-2002 AS A LOW SECURITY INMATE WITH "IN" CUSTODY. HIS PROJECTED RELEASE DATE IS  03-26-2011, VIA  MANDATORY PAROLE. HE HAS APPROXIMATELY 5 YEARS REMAINING TO SERVE. HE IS SERVING THIRTY YEARS WITH TEN YEAR MINIMUM TERM FOR ASSAULT W/I TO KILL, MALICIOUS DISFIGUREMENT, ARSON, DESTROYING PROPERTY.  INMATE FORRESTER HAS FOLLOWED ALL OF THE UNIT TEAM'S RECOMMENDATIONS AND HE HAS COMPLIED WITH INSTITUTION'S RULES AND REGULATIONS.  FCC COPELAND, FLORIDA, HAS BEEN CONTACTED REGARDING THE BUSINESS ADMINISTRATION, DENTAL ASSISTANT, AND HEATING VENTILATION AND AIR CONDITION COURSES HAVE A TWO-YEAR WAITING LIST AND A TWO-YEAR COMPLETION FOR AN A.A. DEGREE. THESE COURSES REQUIRE A GED OR HIGH SCHOOL DIPLOMA. INMATE FORRESTER PROGRAM ACHIEVEMENTS WHILE INCARCERATED HAVE BEEN EXEMPLARY.  HE HAS COMPLETED THE FINANCIAL RESPONSIBILITY PROGRAM AND DEMONSTRATED GOOD INSTITUTIONAL ADJUSTMENT. BASED ON THE ABOVE, THE UNIT TEAM IS REQUESTING THAT INMATE FORRESTER BE TRANSFERRED TO ANY APPRENTICESHIP PROGRAMS IN BUSINESS, CULINARY, HEATING VENTILATION AND AIR CONDITION FOR PROGRAM PARTICIPATION.

| 5A.  PAROLE HEARING SCHEDULED: __XX__ YES  ____ NO | B.  IF YES, WHEN 03-2007 /STATUTORY INTERIM HEARING |
|---|---|

6.  NOTE ANY PAST OR PRESENT BEHAVIOR AND/OR MANAGEMENT/INMATE CONCERNS. N/A

STAFF HAVE CHECKED THE FOLLOWING SENTRY PROGRAMS TO ENSURE THAT THEY ARE CORRECT AND CURRENT:

    INMATE PROFILE                    CIM CLEARANCE AND SEPARATEE DATA
    INMATE LOAD DATA               CUSTODY CLASSIFICATION FORM
    SENTENCE COMPUTATION       CHRONOLOGICAL DISCIPLINARY RECORD

| PREPARED BY: O. Davis/CASE MANAGER | UNIT MANAGER: K.S. Powell |
|---|---|

IF THE TRANSFER IS APPROVED, A PROGRESS REPORT WILL BE COMPLETED PRIOR TO TRANSFER.
*FOR MARIEL CUBAN DETAINEES - STAFF HAVE ENTERED THE CMA ASSIGNMENT OF "CRP RV DT" TO INDICATE THE NEED FOR A CUBAN REVIEW PANEL HEARING FOUR MONTHS FROM HIS/HER ROLL-OVER DATE.
(THIS FORM MAY BE REPLICATED VIA WP)                    THIS FORM REPLACES EMS-409 OF AUG 99

**EXHIBIT ONE**

washingtonpost.com

# Changes Pledged At N.C. Prison

D.C. Concerns Aired at Hearing

By Robert E. Pierre
Washington Post Staff Writer
Wednesday, October 17, 2007; B01

The private North Carolina prison where about 1,000 D.C. inmates are held, the most in any single place nationwide, has substandard drug treatment and vocational training programs compared with most federal facilities, the U.S. Bureau of Prisons said yesterday.

Harley G. Lappin, the bureau's director, said he is revising the federal government's contract with the Rivers Correctional Institution to make the facility "mirror as close as we can the programs offered in other prisons."

The acknowledgment came after years of complaints from inmates, their families and prisoner advocates about Rivers, which is about 200 miles from the District in Winton, N.C. Lappin promised the changes during a hearing convened by Del. Eleanor Holmes Norton (D-D.C.), who has been pressing the Bureau of Prisons to make reforms.

Norton has contended in recent months that the 7,000 D.C. inmates in 75 institutions nationwide get "second-class" treatment compared with the rest of the 200,000 inmates under federal control. She recently visited Rivers and a federally run prison in Cumberland, Md., to compare the way inmates are treated. Activities at the two places were as different as night and day, she said.

At Rivers, Norton said, inmates had too much unproductive free time. At Cumberland, programming was more organized, with inmates shuttling from one event to the next.

D.C. inmates at Rivers are held alongside immigrants who have committed crimes and are serving their time before being deported to their home countries. Those inmates often are not offered the same programs in prison as U.S. citizens.

"If you're a District resident, you get tired of not having rights, even when you go to jail," said Norton, who at times grew testy with prison officials.

Nonviolent federal offenders get a year off their sentences if they complete a 500-hour drug treatment program.








**EXHIBIT TWO**

But prisoners serving time for D.C. offenses get no such consideration, even though the D.C. government passed a law two years ago that said they deserved the time off. Lappin said he expected the disparity to be changed soon.

The congressional hearing was the first in the decade since the District asked the federal government to assume control of its prisoners. Norton said the scrutiny was long overdue because inmates were hundreds or thousands of miles away, out of sight and out of mind of most residents.

But their families never forgot that their loved ones, once sequestered at the Lorton prison complex in Northern Virginia, needed more attention. Hundreds, in fact, showed up at a recent meeting to voice their concerns.

Yesterday, two former inmates appeared on Capitol Hill.

Douglas Robinson, 52, has been incarcerated for 16 years, 11 at Lorton and the rest in Bureau of Prisons facilities. At two of the institutions, he said, he often could not enter programs he wanted because they were full or canceled. But he credited a 500-hour drug treatment program at Butner Federal Correctional Institution in North Carolina with helping to save his life.

"For so long, I had ducked and dodged that I had a problem," he said. "I learned that my behavior was causing my problem. When I arrived home, I made a choice to move on with my life." Out for six months, he now works at Goodwill Industries, stocking trucks.

Kevin Barnes, 30, served three years at Rivers. The library was cramped and contained few books, he said. The focus instead was athletics, and the majority of inmates spent their time playing basketball, football and other sports.

"That's not going to help an inmate when they come home," said Barnes, who said he now works as an electrician.

The GEO Group, a company that runs 68 correctional and residential treatment facilities worldwide, owns and operates Rivers. The prison's warden, George Snyder, defended the institution in testimony yesterday, saying that there are plenty of classes, in such areas as anger management and computer skills, available for inmates. As a career prison official, Snyder said, he is committed to providing even better programs.

Lappin agreed that programming is only part of the problem.

"You've got to have a willing participant," he said. "It's not a one-sided formula. We do not force inmates into programs, except all prisoners who are medically cleared will work. We counsel, we push for educational training. . . . Some offenders just don't see the light."

The hearing was held before a subcommittee of the Committee on Oversight and Government Reform, and Rep. Danny K. Davis (D-Ill.) said the prisoner problems are an issue all over the nation.

Changes Pledged At N.C. Prison

"Many of these ex-offenders are returning to their communities unprepared and without the support they need to sustain their new lives," said Davis, chairman of the subcommittee on the federal workforce, Postal Service and the District of Columbia. "Without structure and support to help ensure a lasting transition, we are unwittingly creating a revolving door for former inmates."

**Post a Comment**

View all comments that have been posted about this article.

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

© 2007 The Washington Post Company

Ads by Google

5 Blade Razors
First Of Its Kind. Gillette & The Art Of Shaving Power Razor wlight.



# Congresswoman
# ELEANOR HOLMES NORTON
## District of Columbia

**For Immediate Release**
**August 14, 2007**

**Contact: Julia Hudson**
**(202) 225-8050**
**Julia.Hudson@mail.house.gov**
**Web Site: http://www.norton.house.gov**

### Norton's Eye Opening Visit To Rivers Correctional Institution Underscores Need for Inmate Substance Abuse Treatment and Many Other Services
### Hearings in September

Washington, DC-- Congresswoman Eleanor Holmes Norton (D-DC), in the first visit by a D.C. elected official to Rivers Correctional Institution, assured D.C. inmates that with the change in the control of Congress, oversight has begun and that she is working to make sure that Rivers inmates have access to the same programs as others at Bureau of Prisons (BOP) facilities around the country. With clear signs of increase in crime in D.C., Norton told Warden George E. Snyder and Rivers and BOP personnel that her first priority is increasing substance abuse treatment. A limited, non-certified program is available only to 60 of the 1,355 inmates, although 50 to 80 percent have substance abuse problems. "The reported 65% recidivism rate can be traced back largely to putting men on the streets with no money, no plan for the future, and an unresolved drug habit," Norton said. Inmates in many BOP facilities get early release incentives upon completion of a 500 hour drug treatment program, which is unavailable at Rivers. Thus, D.C. prisoners have less encouragement to enroll in the program (although the Rivers program has a waiting list), and get far less effective drug treatment, if any, before coming back to D.C. "I told the inmates that providing substance abuse treatment that works is my first priority," she said, "to assure that they break the habit that got most of them there and to relieve the burden none of them wants to put on their family, friends and the city."

Norton toured the health and dental care units, GED and life skills classes, the cafeteria, kitchen, commissary, and programs that included woodworking with a focus on cabinet making and computer classes. She had access to all parts of the facility and spoke with individuals and groups of inmates at will in the yard, in their living quarters, and in the halls of the institution. Many felt free to stop Norton and have discussions or air complaints that ranged from the size of the gratuity once released to the need for the same programs at Rivers as at other BOP facilities.

A Rivers official told the Congresswoman and her staff that the level of education for many D.C. inmates at Rivers is high and often above high school level, but there are no higher education programs for these individuals. Norton will seek discussions with the University of the District of Columbia concerning providing college correspondence courses. The D.C. Office of the State Superintendent of Education also provides a federally financed program for inmates aged 19 to 26 to receive Heating, Ventilation, and Air Conditioning (HVAC) training through the local community college, Roanoke-Chowan Community College.

**(More)**

The Norton visit begins a much longer investigation and oversight of D.C. inmates and facilities. Because law enforcement agencies, including prisons and courts, are now 100% federally funded, D.C. no longer has jurisdiction to do the requisite oversight to make improvements. "The buck literally has been passed to the federal government, and with it, the responsibility. It is time Congress assumed the oversight responsibility that goes with the funding." However, Norton is concerned to get more formal D.C. involvement, especially in seeking untapped available federal funding, and with reentry.

Norton has said that D.C. inmates are treated as second class citizens by BOP, but she says the major blame belongs with Congress, which has provided no oversight since the transfer in 1997 and inadequate funding. Norton told the inmates she visited with yesterday, "I am here to do my part to get the necessary funds so that inmates from the District of Columbia receive the same services prisoners across the country receive from the Bureau of Prisons." However, she also told the inmates that the city wants them to do their part to stay clean and out of jail.

The Congresswoman will hold a series of hearings focused on Rivers. The first will be a teleconference between the Black Men and Boys Commission and Rivers inmates, and an official hearing to be held September 18th will focus on transition services and community supervision. Norton will continue to pursue equal treatment of District inmates as she looks into how the 7,000 D.C. residents scattered across the country are housed and how to bring them closer to home. She also will visit BOP prisons in the coming month. She is concerned that lack of family contacts and difficulty accessing services in the community, coupled with lack of substance abuse treatment, exacerbates the difficulties the District and the inmates have in effectively integrating these residents back into the community.

Rivers, originally built as a 1,200 bed facility, currently houses 1,355 inmates and has an expanded inmate capacity of 1,380 inmates as of August 13, 2007. District of Columbia residents make up approximately 65% of the total inmate population, with the other 35% comprised of criminal immigrants from various areas. No other citizen inmates are housed in private facilities. The average incarceration time in this low security facility is less than two years. The average age of the inmates is 40 years old, necessitating more health care than normal. A healthcare lawsuit is being brought by the Washington Lawyer's Committee for Civil Rights and Urban Affairs' D.C. Prisoners' Project.

###

HENRY A. WAXMAN, CALIFORNIA,
  CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
  DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5051
FACSIMILE  (202) 225–4784
MINORITY  (202) 225–5074
TTY  (202) 225–6852

http://oversight.house.gov

TOM DAVIS, VIRGINIA,
  RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
——

**STATEMENT OF CHAIRMAN DANNY K. DAVIS**
**AT THE SUBCOMMITTEE ON FEDERAL WORKFORCE,**
**POSTAL SERVICE AND THE DISTRICT OF COLUMBIA**

**HEARING ON**

**"Doing Time: Are DC Prisoners Being Adequately Prepared for Reentry with Equal Access to BOP Services?"**

**October 16, 2007**

Good afternoon, welcome to today's hearing to examine the rehabilitative services at Rivers Correctional Institution (RCI), a privately-run Federal Bureau of Prisons (BOP) facility housing D.C. inmates and foreign-born residents. There are two million Americans in prisons in the United States. Each year, more than 650,000 ex-offenders released from state and federal prisons will return to civilian life. These men and women deserve a second chance to break the grip of a drug habit, a chance to support a family, to pay taxes, and to be self-sufficient. Many of these ex-offenders return to their communities unprepared and without the support they need to sustain their new lives.

This is why I have sponsored H.R. 1593, the "Second Chance Act"; it is a bipartisan bill that addresses reentry reform with a comprehensive approach to help eliminate barriers and increase access to transitional services for ex-offenders. A third of all correction departments provide zero services to released ex-offenders, and most do not offer a transitional program, thereby, placing a heavy burden on families and communities. Without structure and support to help ensure a lasting transition, we are unwittingly creating a revolving door for former inmates. These individuals pay a price, as do their families, and society.           **EXHIBIT THREE**

Ex-offenders face many barriers that impede their return to society, which include: serious physical and mental health problems, homelessness, and lack of education or minimal qualifications to hold a job. As a result, two out of three ex-offenders will be rearrested for new crimes within the first three years after their release. This hearing will help shed light on the importance of transitional services for ex-offenders not only in the District of Columbia, but across the country. Currently, 7,000 District inmates under federal jurisdiction are spread across 75 institutions and 33 states. Since the passage of the National Capital Revitalization and Self-Government Improvement Act of 1997 Congress has not conducted any hearings into BOP's management of DC prisoners.

My colleague, Delegate Eleanor Holmes Norton has been to Rivers Correctional Institution, in Winton, North Carolina, and the Federal Prison Institution in Cumberland, Maryland. She spoke to inmates and prison officials at both institutions. I commend her for her efforts to learn more about the educational and transitional services offered to DC inmates at BOP facilities.

Thank you and I look forward to hearing from today's witnesses.



**The GEO Group, Inc.**

Written Testimony Of

George E. Snyder, Warden

Rivers Correctional Institution

Before

The House Committee On Oversight And Government Reform

Subcommittee On The Federal Workforce, Postal Service, And The

District of Columbia

Regarding

Program Offerings At Rivers Correctional Institution

EXHIBIT FOUR

**Chairman Davis and Distinguished Members of the Subcommittee:**

My name is George Snyder, Warden of Rivers Correctional Institution, Winton, North Carolina. On behalf of The GEO Group, Inc., I thank you for the opportunity to testify today regarding the various programs offered to inmates housed in our facility.

Let me first, though, provide you with an overview of our company and the history of how Rivers Correctional Institution came into existence.

The GEO Group, Inc. is a world leader in the delivery of correctional, detention, and residential treatment services to federal, state, and local governmental agencies around the globe. GEO offers a turnkey approach that includes design, construction, financing, and operations. GEO represents government clients in the United States, Australia, South Africa, Canada, and the United Kingdom. GEO's worldwide operations include 68 correctional and residential treatment facilities with a total design capacity of approximately 59,000 beds.

The National Capital Revitalization Act of 1997 mandated that the Bureau of Prisons house a portion of District of Columbia, sentenced felons in private contract facilities. The BOP subsequently adopted a course of action that included soliciting bids for contract facilities, closing the existing Lorton, Virginia facility, and transferring inmates to contracted facilities.

On March 7, 2000, the BOP signed a contract with The GEO Group, Inc. to design, build, finance, own, operate and manage a low security, adult male facility in Winton, North Carolina. We received our first DC inmates in March of 2001. Located on a 257-acre tract in rural Hertford County, the facility is a campus design with four housing buildings, indoor and outdoor recreational areas, a central programs building, a prison industries building, and an administrative building. The design enables cost-effective utilization of security staff supplemented by modern electronic surveillance, which in turn allows enhanced programmatic activities without significant budgetary implications. Our average inmate population is 1350, with approximately 54 percent of the inmates coming from the District of Columbia. Rivers Correctional Institution is 226 miles from Washington, D.C.

The facility is accredited by the American Correctional Association and the Joint Commission on Accreditation of Healthcare Organizations.

## RIVERS CORRECTIONAL INSTITUTION PROGRAMS

**Psychology Department:**

All inmates admitted to the institution are provided an initial assessment by psychology staff. During this assessment, it is determined if an inmate is in need of additional psychological services, to include individual counseling, group counseling, substance abuse counseling, and/or psychiatric services. Currently, approximately 55 inmates are prescribed psychotropic

2

medication for a variety of mental illnesses from depression to schizophrenia.

At any given time, approximately sixty inmates are receiving regular bi-weekly to monthly individual counseling sessions, focusing on topics including problem-solving, conflict resolution, parenting skills, bereavement, victim empathy, relationship difficulties, and sex offender treatment.

A variety of staff and inmate-facilitated groups are offered, including Anger Management, Stress Management, and Doing Time with the Right Mind (DTRM), a Therapeutic Film Group, and a Fathers Support Group. DTRM is a 9-week, inmate-facilitated program that emphasizes improving communication between staff and inmates. It also helps inmates to use their time in prison wisely to better prepare themselves for release. The Therapeutic Film Group uses the themes of contemporary films as a therapeutic tool to illicit emotions and provide a foundation on which to discuss these emotions and other related issues. The Fathers Support Group is an ongoing self-help group that focuses on improving parenting skills.

Over the course of the past six months, 42 inmates have participated in the Anger Management Group, 6 inmates have successfully completed the Stress Management Group, and 32 inmates have participated in the Therapeutic Film Group. In April and August 2007, graduations for the DTRM Program were held with a combined total of 108 inmates graduating and receiving certificates of completion. Currently, 60 inmates are participating in DTRM, and 13 in the Fathers Support Group.

Additional services provided by psychology staff include, but are not limited to, crisis intervention, suicide assessments, psychiatric referrals, ongoing mental status assessments in the Special Housing Unit (SHU), psychological evaluations for US Parole Commission, and marriage evaluations.

**New Beginning Drug Treatment Program:**

RCI offers a nine-month residential drug treatment program that provides a continuum of treatment services to inmates with a documented history of substance abuse problems. The philosophy of the program holds that both substance abuse and recovery have a cause, a course, and a predictable outcome. This comprehensive program is conducted within a highly structured regimen of a modified therapeutic community composed of inmates with similar problems living and working together, elements critical to building a sense of community and cohesiveness among participants and staff, and promoting conformity and compliance with program rules and philosophy. Drug treatment staff are also based in the inmate housing unit in order to further the sense of community and cohesiveness.

The program has three phases of treatment:

Phase I – Orientation: Designed to acquaint the new inmate with the basic concepts of the therapeutic community and chemical dependency treatment. The inmate begins to participate in the development of an individual treatment plan, setting goals and accepting responsibility for his own behavior.

Phase II – Main Treatment: Focuses on the exploration of chemical dependency and associated recovery issues. The inmate continues the process of self-examination and works toward developing positive attitudes and behaviors.

Phase III – Re-entry: Provides a period for solidifying new behaviors and attitudes into lasting habits, which will support this lifelong process of recovery. The inmate develops relapse prevention and aftercare plans, addressing all areas of his life, i.e., family, employment, housing, individual recovery, and use of community resources.

Throughout participation in the program, inmates are required to participate in weekly NA/AA meetings. These meetings may be facilitated by staff, inmates, or outside volunteers.

After completing the program, inmates are provided with an opportunity to continue their involvement in treatment through the Aftercare Program. Participation in weekly aftercare meetings provides a forum for inmates to practice skills acquired during treatment and prevents inmates from slowly returning to old behavior patterns.

The program can accommodate 57 inmates in active treatment, with three additional inmates serving in the role as "cadre." Cadre inmates have completed treatment and are assigned as counselor aides, performing duties such as lectures and group facilitation. Since the program's inception in 2003, 155 inmates have completed the nine-month program.

Participation in the RCI residential drug treatment program does not preclude transfer of an inmate to a BOP facility for participation in the BOP 500-hour drug treatment program.

**40-Hour Substance Abuse Education:** This program provides inmates with information on alcohol and drugs as well as the physical, social and psychological impact of these substances. The course is considered a prerequisite for the therapeutic drug program.

Participation in the program is mandatory if: there is evidence in the Pre-Sentence Investigation that alcohol or other drug use contributed to the commission of the instance offense; alcohol or other drug use was a reason for violation of supervised release, including parole or Residential Re-entry Center placement for which the inmate is now incarcerated; or the inmate was recommended for drug programming during incarceration by the sentencing judge.

Inmates who are not required to participate in the program may request to participate voluntarily. Unit and psychology staff also recommends participation.

**Community Resource Day:**

Court Services and Offender Supervision Agency (CSOSA) is a federal agency providing supervision of adults on probation, parole and supervised release in the District of Columbia. Once a quarter CSOSA joins RCI in presenting a Community Resource Day in an effort to assist inmates with release preparation and transition planning via videoconference or in person.

Groups of over 200 D.C. inmates due to be released within 90 days participate in each resource day.

There are two basic elements of the program: During the morning segment the U.S. Parole Commission staff cover conditions of parole and supervised release; a representative from Hope Village Residential Reentry Center covers rules and responsibilities tied to halfway house residency; CSOSA's Community Supervision Officers explain how they conduct home plan investigations as well as the requirements of community supervision. A representative from Child Support Services Division of the Office of the D.C. Attorney General explains their enforcement policies and the benefits of compliance. The afternoon segment focuses on the critical areas of employment, education, health care and housing.

**Hope House DC Programs:**

Hope House DC was founded to serve the needs of DC inmates by offering programs to keep inmates and their families connected.

**Father-to-Child Reading Program:** Inmate fathers participating in this program are provided a children's book and audio or videotape; the inmate then records the book for his children. The book and the tape are mailed to the child. Parents and caregivers report that children not only enthusiastically listen to the recording, but do so repeatedly, reliving the experience of their father telling them a story.

**Father-to-Child Teleconference Program:** Children are brought to the D.C. Hope House where they may visit with their fathers face-to-face through a live teleconference hookup.

**Father to Child Summer Camp:** One week each summer, children from the D.C. area attend day camp with their fathers at RCI. Hope House staff and camp counselors guide the campers through crafts, drama, games, creative writing and other activities designed to help parent and child reconnect and strengthen the parent-child relationship. In the evening the children and counselors retreat to a local campground where they participate in crafts and recreation.

**Video Mentoring Program:**

A 1997 study showed that in the District of Columbia, one in two African American men ages 18 to 35 were under some form of correctional supervision. Given those statistics, and with an estimated 2,500 inmates returning to the District this year alone, law enforcement and church groups have set up a pilot mentoring program that involves church volunteers. The program pairs inmates with personal mentors to help them navigate the first difficult months out of incarceration, where everything from applying for a driver's license to navigating the Metro can be a frustrating challenge.

Run by the Court Services and Offender Supervision Agency (CSOSA), and a faith-based advisory committee chaired by the Rev. Donald Isaac, Associate Pastor of Southeast Tabernacle Baptist Church, Washington, D.C., this year-old program has so far matched about 100 inmates

and mentors. The idea is to focus intense attention on each inmate in the hope that none returns to drug use or other criminal habits once released.

Agency officers screen inmates still in prison who have volunteered for the program. The inmate/mentor pairs then meet and talk, in person or on the phone, developing a relationship that might last into the future.

**Education Programs:** Approximately 32 percent of the inmate population participates in either vocational or academic programs. Average monthly enrollment for academic education is 261, vocational education 101, and Life Skills 85.

Academic Programs include: English as a second language, adult basic education, pre-GED, and GED, and life skills/parenting. In 2007, 49 students received their General Equivalent Diploma and five students graduated from the English as a Second Language program.

> **English as a Second Language (ESL):** Instruction is provided to non-English speaking and English speaking persons who are not fluent in the English language. Classes focus on survival language skills. The program is designed to enable inmates to function at the equivalent of an eighth grade level of education.

> **Adult Basic Education (ABE):** Designed primarily for adults whose basic skills are below the ninth grade level, ABE classes focus on helping adults function more effectively in today's technological world by improving their reading, writing and math skills. Graduates of this program are encouraged to continue studies in the Pre-General Education Development program.

> **Pre-General Equivalent Diploma (GED):** This course is designed for students who comprehend on or at least a fifth grade level. Students are guided through an individualized process by the instructor and given a six-part examination comprised of all core curriculum courses (Science, Social Studies, Mathematics, Literature and Arts, and Writing Skills). Graduates are encouraged to continue studies in the GED program.

> **General Equivalent Diploma (GED):** This course is offered as a means for adults with educational skills at the high school level to earn the equivalent of a high school diploma. In preparation for the GED Exam, students are guided through an individualized study process and given GED practice tests. Roanoke Chowan Community College, Ahoskie, North Carolina, administers the official GED examination. If he passes, the graduate receives a High School Diploma Equivalency Certificate from the North Carolina Community College System.

> **Life Skills/Parenting:** The Life Skills program focuses on providing students with direction in dealing with many everyday life situations that they may encounter upon release. Students are taught to understand and build their self-esteem while learning to understand other people. They learn procedures for securing a driver's license, how to write checks, financial budgeting, the importance of maintaining a job, how to submit

resumes and apply for jobs. Parenting focuses on providing parent education in the areas of positive relationships, family values, mutual support and nurturing.

Vocational Programs includes computer technology, woodworking, heating and air conditioning, workforce transition, workforce transition, Corrections Learning Network, and Wheels for the World.

**Keyboarding:** This course is designed to teach basic keying skills and procedures. Emphasis is placed on the daily use of a computer system to develop skills with concentrated application of these skills to the production of business correspondence.

**Computer Technology I and II:** These programs are designed to teach students more than just document preparation. Desktop publishing is a component of this course that teaches the students to produce documents that are more creative, fun and effective in communicating messages. The student learns skills necessary for writing newsletters, creating styles, outlines, tables and tables of content. Students learn desktop features and design tips that help them to use art and color and use the drawing toolbar to create original artwork for their documents. Students are taught how to prepare basic worksheets, and to design, create, retrieve and enhance slides.

**Woodworking:** In a woodshop setting, the woodworking program focuses on transferable skills and stresses understanding and demonstration of the following elements of woodworking: planning, technical and product skills, health and safety and environmental issues, concepts of residential framing, residential planning and design and building code requirements. The student has hands-on instruction in the use of hand tools, operating portable power tools and stationary power woodworking machines.

**Heating, Ventilation and Air Conditioning (HVAC):** In this course students are introduced to the basic refrigeration process used in mechanical refrigeration and air conditioning systems. It covers the requirements for EPA certification and examinations and introduces common business and customer relation practices that may be encountered in HVAC. Some topics include terminology, safety, identification and function of components, refrigeration cycle, tools, instrumentation used in mechanical refrigeration systems, small appliances, and high and low pressure systems. Upon completion students should be able to identify refrigeration systems and components, explain the refrigeration process, use the tools and instrumentation of the trade, demonstrate knowledge of refrigerants, and be prepared for the EPA certification examination, present themselves to customers in a professional manner, understand how the business operates, complete invoices, and handle complaints.

**Workforce Transition:** A joint program conducted by the University of the District of Columbia, the Court Services and Offenders Agency and Rivers Correctional Institution staff, the program is a work-readiness program that prepares the individual inmates for resources and actions dedicated to addressing workforce needs and marketable skills. The training workshops include resume assistance, certifications, professional development, interview techniques, educational referrals and the basic job-hunting skills.

**Corrections Learning Network (CLN):**  The CLN program is a distance learning initiative administered by the Educational Service District 101 and funded through a Star School Grant from the U.S. Department of Education.  The Education Service District provides the RCI Educational Department with DVD's to enhance our Life Skills/Parenting, Release Preparation Program, and our Literacy programs.   DVD Resource topics include, but are not limited to:

| | |
|---|---|
| Work Performance | GED Math |
| Problem Solving | Science |
| Workplace Communication | Language Arts, Writing and Reading |
| Lifestyle & Wellness | |

**Wheels for the World:**  Wheels for the world Program, founded by Joni and Friends, is a nonprofit organization located in Agoura Hills, California.  Wheels for the world collects donated wheelchairs from across the United States through an organization called Chair Corps Organization.  Volunteers collect, store and transport wheelchairs to and from various prisons participating in the program.

Rivers Correctional Institution began participating in the Wheels for the World Program in August of 2007.  The program assists inmates in developing the necessary skills to master the basic concepts of wheelchair repair, including wheelchair identification, design, purpose and tool identification.  15 inmates are currently assigned to refurbish and repair wheelchairs.  A total of 63 chairs have been repaired and ready for distribution.

**Conclusion:**  Mr. Chairman, let me conclude by emphasizing that we at Rivers Correctional Institute are committed to providing inmates in our care with treatment and training programs that help them become productive and responsible members of their community upon release.  I appreciate the subcommittee's interest in this important issue, and I am happy to answer any questions the subcommittee members may have.

8

 **Department of Justice**

STATEMENT
OF
HARLEY G. LAPPIN
DIRECTOR
FEDERAL BUREAU OF PRISONS


BEFORE THE
FEDERAL WORKFORCE, POSTAL SERVICE, AND
THE DISTRICT OF COLUMBIA SUBCOMMITTEE
OF THE
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

U.S. HOUSE OF REPRESENTATIVES


CONCERNING

INMATE PROGRAMS AT RIVERS CORRECTIONAL INSTITUTION


PRESENTED ON

OCTOBER 16, 2007


**EXHIBIT FIVE**

Statement of Harley G. Lappin
Director, Federal Bureau of Prisons
Before the Federal Workforce, Postal Service, and
the District of Columbia Subcommittee
of the
Committee on Oversight and Government Reform
U.S. House of Representatives
October 16, 2007

Good Morning Chairman Davis and Members of the Subcommittee.

I appreciate the opportunity to appear before you today to
discuss the role of the Bureau of Prisons in the confinement,
care, and treatment of offenders from the District of Columbia.

The Bureau of Prisons (BOP) is responsible for the care and
custody of more than 200,000 inmates in 114 Federal institutions
and a number of contract facilities throughout the United States.
We are responsible for the incarceration of inmates who have been
sentenced to imprisonment for Federal crimes and the detention of
individuals awaiting trial or sentencing in Federal court.   In
addition, based on a 1997 Federal law, our agency is also
responsible for the District of Columbia's sentenced felon inmate
population.

The National Capital Revitalization and Self-Government
Improvement Act of 1997 (Title XI of the Balanced Budget Act of
1997 (P.L. 105-33)) required the BOP to assume responsibility for
the incarceration of District of Columbia (D.C.) sentenced felons

2

by December 31, 2001. The law also requires us to treat D.C. Superior Court inmates as much like Federal inmates as possible, stating: "Such persons shall be subject to any law or regulation applicable to persons committed for violations of laws of the United States consistent with the sentence imposed."

Immediately after passage of the Act, the BOP began working with the D.C. Department of Corrections to ensure that the transfer of inmates would be orderly and efficient. Our ambitious construction schedule and our use of some State correctional institutions and some privately-operated facilities allowed us to meet the Act's requirement prior to the deadline; the transfer was completed in November 2001.

The Act further required the BOP to house at least 2,000 D.C. sentenced felons in privately-operated facilities by December 31, 1999, and to confine 50 percent of D.C. sentenced felons in private facilities by September 30, 2003.

The privatization requirements of this Act were superceded by a provision in Public Law 106-553 (enacted on December 21, 2000) which provides that, beginning in fiscal year 2001 and thereafter, the BOP may confine in privately-operated prisons only those D.C. inmates who are determined to be appropriate for

-2-

such placement based on Federal classification standards and any threat they may pose to public safety.

After the Revitalization Act passed in 1997, we initiated a process to procure private contract beds as required by the statute.  We divided the procurement into two phases for two separate contract facilities.  The first phase of the procurement resulted in a 1999 contract award for a facility in Philipsburg, Pennsylvania.  Originally, the facility was slated to confine and manage 300 female D.C. inmates of various security levels, 350 minimum-security male D.C. inmates, and 350 D.C. Youth Reform Act inmates of various security levels.  The contract experienced some delays due to environmental and legal challenges.  We reassessed our needs and our decision regarding the population that would be confined at the Philipsburg facility.  We determined that the population should consist of 1,300 low-security male inmates -- primarily low-security Federal criminal aliens and D.C. inmates.  Construction of the Moshannon Valley Correctional Center began in October 2004, and the facility opened in April 2006.

The second phase of the procurement resulted in a contract with the Rivers Correctional Institution in Winton, North Carolina. The original contract for this facility called for the

-3-

confinement and management of approximately 1,200 low-security
D.C. inmates.  The Statement of Work for the Rivers facility
allows for the designation to this institution of other low-
security inmates.  The contract was awarded in March 2000, and
the facility opened in March 2001.  Rivers Correctional
Institution began receiving inmates in April 2001.

In February of this year, based partly on tensions between the
criminal aliens and D.C. inmates at the Moshannon Valley
Correctional Center, we transferred all of the D.C. inmates out
of that facility.  The vast majority of these D.C. inmates were
redesignated to Rivers Correctional Institution.

Currently, Rivers Correctional Institution confines approximately
1,300 inmates -- approximately 700 D.C. inmates and approximately
600 criminal aliens.  The Moshannon Valley Correctional Center
now confines approximately 1,500 low-security Federal criminal
aliens.

**Inmate Programs**

The mission of the Bureau is to provide safe, secure, humane, and
cost-effective confinement of inmates, and to provide
opportunities for offenders to gain the skills that they will
need to return to society as productive and law-abiding citizens.

-4-

Our programs stress the development of the work skills and life skills needed to enhance employment upon release and to help inmates maintain a crime-free lifestyle.

Our inmate programs include work, education, vocational training, substance abuse treatment, opportunities for religious observance, counseling, and other programs that impart essential life skills and pro-social values.  We also provide a variety of other structured activities that are designed to teach inmates productive ways to use their time.  Preparation for reentry begins in the first days of an inmate's incarceration.  The vast majority of our inmate programs and services are geared toward helping inmates prepare for their eventual release.

The core inmate programs at all BOP facilities include:

- Work Programs -- which includes work in institution jobs and in the Federal Prison Industries Program.
- Education -- including literacy classes (to obtain a General Educational Development certificate), English as a Second Language, adult continuing education, parenting classes, recreation activities, wellness education, and library services.
- Occupational Training
- Vocational Training (VT)

-5-

- Substance Abuse Treatment -- including drug education, nonresidential treatment, residential treatment, and community transition treatment.
- Observance of Faith and Religion
- Psychology Services and Counseling
- Visiting, Telephone, and Correspondence Privileges
- Release Preparation -- which includes institution-based programs and use of residential reentry centers.

In addition, many institutions offer additional pro-social values programs to address a variety of needs among certain segments of the inmate population (including younger offenders and high-security inmates).  These programs focus on inmates' emotional and behavioral responses to difficult situations and emphasize life skills and the development of pro-social values, respect for self and others, responsibility for personal actions, and tolerance.

We also continue the implementation of our Inmate Skills Development initiative.  This is a strategy the BOP has undertaken to unify our inmate programs and services into a comprehensive reentry strategy.  The three principles of the Inmate Skills Development strategy are: (1) inmate participation in programs must be linked to the development of relevant inmate

-6-

reentry skills; (2) inmates should acquire or improve a skill identified through a comprehensive assessment, rather than simply completing a program; and (3) resources are allocated to target inmates with a high risk for reentry failure.

D.C. inmates confined in the Rivers Correctional Institution are offered the opportunity to participate in programs; however, we now believe that the vocational training and residential drug abuse treatment programs are inadequate. We have identified a need to expand vocational training programs, and we intend to enhance and certify the residential substance abuse treatment program so that more low-security D.C. inmates can receive such treatment at a location that is closer to the District.

In November 2006, we evaluated the range of programs at Rivers Correctional Institution and identified a specific need for enhanced vocational training. In December, we asked the GEO Group Inc., the company that operates the facility, to submit proposals to increase programming that these facilities.

We received three proposals from the GEO Group to implement a plumbing vocational training program, a carpentry VT program, and an electrical VT program; and in February 2007 we focused our efforts on these proposals. In March, we sent the three

-7-

proposals to the Court Services and Offender Supervision Agency (CSOSA) for their review.  CSOSA's review is to help to ensure the programs will meet appropriate national curriculum standards and will provide D.C. offenders with marketable skills.  CSOSA will also help ensure that links to continuing vocational, apprenticeship, or on-the-job training will be in place for inmates who do not complete the program during incarceration.

## Residential Drug Abuse Treatment and Reduction in Term of Imprisonment

The BOP has provided some form of substance abuse treatment to inmates for decades.  The Violent Crime Control and Law Enforcement Act of 1994 mandates that the BOP provide residential substance abuse treatment to all eligible prisoners with priority based on proximity to release date and allows the BOP to reduce the term of imprisonment for nonviolent offenders who successfully complete the residential program.

While the statute applies only to inmates convicted in Federal court, in our effort to treat D.C. Superior Court inmates as much like Federal inmates as possible, we offer residential drug abuse treatment to D.C. Superior Court inmates as well.  These offenders have participated in residential treatment, and they have been eligible for many of the incentives we offer -- the exception is the possible reduction in their term of

-8-

imprisonment.   However, changes to that exception are
forthcoming.

On May 24, 2005, the D.C. City Council passed the Omnibus Public
Safety Ex-Offender Sufficiency Reform Amendment Act of 2004.
Among its several provisions, this law allows non-violent, D.C.
Code offenders to receive a reduction of up to 1 year off their
term of imprisonment upon successful completion of the
residential substance abuse treatment program.   We published a
proposed rule to implement this law on November 2, 2006.   We have
composed a final rule and will publish the rule in conjunction
with issuing our own updated policy, which is currently in the
final review and clearance process.

**Conclusion**

Mr. Chairman, this concludes my formal statement.   I would be
pleased to answer any questions you or other Members of the
Subcommittee may have.

-9-

**STATEMENT**

**OF**

**PAUL A. QUANDER, JR.,**
**DIRECTOR,**
**COURT SERVICES AND OFFENDER SUPERVISION AGENCY**
**FOR THE DISTRICT OF COLUMBIA**

**BEFORE THE**

**UNITED STATES HOUSE OF REPRESENTATIVES**
**COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM**
**SUBCOMMITTEE ON THE FEDERAL WORKFORCE,**
**THE POSTAL SERVICE, AND THE DISTRICT OF COLUMBIA**

**OCTOBER 16, 2007**

Chairman Davis, Congressman Marchant, Congresswoman Norton,
and Members of the Subcommittee:

I am pleased to appear before you today. Let me begin by thanking the
subcommittee for this opportunity to discuss the reintegration of men and women
returning to the District of Columbia from prison. As the Director of the federal agency
that supervises approximately 15,200 men and women on community supervision in
Washington, D.C., I know firsthand that the foundation of an individual's successful
reentry can be laid during his or her time in prison. Incarceration provides an opportunity
for the treatment, training, and mental preparation that can determine whether community
supervision is a brief interlude between prison sentences or the beginning of a new way
of life. The National Research Council's Committee on Community Supervision and
Desistance from Crime puts it very succinctly in a new study of parole practices: "[A]

1

**EXHIBIT SIX**

person should not leave prison without an immediately available…plan for postrelease life."[1]

In 1997, the United States Congress passed legislation transferring responsibility for housing long-term prisoners sentenced under the District of Columbia Code to the Federal Bureau of Prisons (BOP). The transfer was completed in 2000.[2] Over 6,600 District of Columbia inmates now serve their sentences in BOP facilities around the country.[3] The largest concentration, about 700 inmates, is housed in a BOP contract facility, the Rivers Correctional Institution in Winton, NC, operated by The GEO Group.

The Court Services and Offender Supervision Agency (CSOSA) was created under the same legislation that transferred D.C. inmates to the BOP, and for much the same reason: to provide financial relief for the District of Columbia by shifting responsibility for a significant criminal justice function to the federal government. CSOSA encompasses the D.C. Pretrial Services Agency, as well as the adult probation and parole supervision functions.

Most of the offenders under CSOSA supervision have long histories of substance abuse, educational underachievement, and underemployment. Their initial risk assessments indicate that 42 percent feel they need substance abuse treatment (and 70 percent have a documented history of drug use); 39 percent are under supervision for drug offenses, and 20 percent have sought substance abuse treatment within the past six months. Only 56 percent have been employed during the past six months, and only 41 percent possess a GED or high school diploma.

With the resources it has received, CSOSA has improved community supervision by lowering caseloads, implementing stringent contact standards and other close supervision strategies, increasing drug testing, opening multiple field offices and

---

[1] "National Research Council, Committee on Community Supervision and Desistance from Crime. "Parole, Desistance from Crime, and Community Integration." Washington, DC: National Academies Press, 2007. (Advance copy cited.)

[2] A Corrections Information Council (CIC) was established within the D.C. Mayor's Office in FY 2003. The CIC's mission was to "represent the District's interest in the well-being of its prisoners in U.S. Bureau of Prisons facilities." To that end, the CIC proposed conducting regular inspections of BOP facilities housing D.C. inmates. The CIC, which might have played a useful role in monitoring services available to D.C. Code offenders and coordinating post-release services delivery, has not met since February 2005.

[3] As of May 31, 2007, according to the Court Services and Offender Supervision Agency's Office of Research and Evaluation.

automating the case management system. In addition, CSOSA has been resourced to provide substance abuse treatment to a fraction of the offenders that need it and to operate a modest learning and vocational service program that supplements the city's overburdened public treatment and employment services capacity. In 2006, CSOSA opened a Reentry and Sanctions Center to provide intensive assessment and treatment readiness programming to both high-risk offenders entering community supervision and those at risk for revocation due to substance abuse. While CSOSA is still implementing some aspects of its program and only beginning to evaluate others, it is clear that community supervision has been transformed in the District of Columbia.

On any given day, about 5,800 of the men and women under CSOSA's supervision are on parole or supervised release. Upon their return to the community, these individuals choose a path leading either back to criminality or to stability and productivity. Recent research on offender reentry stresses that successful reintegration into society begins during incarceration. As BOP Director Harley G. Lappin stated in March, 2006 testimony before the United States Sentencing Commission:

> ...[R]esearch has demonstrated conclusively that Bureau programs such as Federal Prison Industries, vocational training, education, and residential drug treatment have a positive effect on post-release recidivism. Specifically, these core inmate programs have been proven to substantially reduce recidivism, for as long as 12 years following release from prison....[F]or each dollar spent on inmate programs, taxpayers save substantial amounts of money through lower rates of recidivism: as much as $6.23 for prison industries programs, $7.13 for prison vocational training programs, $5.65 for prison education programs, and even $2.69 for prison drug treatment programs.

Clearly, the BOP recognizes that correctional programs can impact post-release success and provide taxpayer benefits.

In planning how best to improve programs and services available to incarcerated men and women from the District of Columbia, several points need to be considered:

- Resources should be dedicated to relevant educational and vocational training programs at a specific facility, and then D.C. Code offenders should be designated to, or transitioned through, that facility.

3

- Qualified staff must be hired and trained to deliver the programs, and program curricula must conform to BOP standards of quality and comprehensiveness.
- CSOSA should be involved in planning for post-release services, so that programming or treatment begun during incarceration can be continued in the community.

With this in mind, if Rivers is to be the institution housing the most D.C. Code offenders, CSOSA recommends the following program enhancements:

- **Substance Abuse Treatment.** CSOSA defines a clinically appropriate course of treatment as including residential, transitional housing, and outpatient care, often with medical detox services as well. If more returning D.C. offenders completed the BOP's 500-hour residential treatment program, and if completion of the program could coincide with the inmate's release to community supervision, CSOSA could then "pick up" services for most inmates with post-incarceration outpatient treatment and aftercare. For those offenders with the highest risk levels, services could be continued through the Reentry and Sanctions Center.

    This level of coordination is consistent with best practices in reentry programming and addresses the most significant public safety threat posed by offenders in the community. Researchers have established beyond question that drug use and crime are related, and that crime escalates in severity and frequency as drug use increases.[4] To coordinate prison-based and community-based treatment might enable a greater proportion of high-risk offenders to receive effective treatment and reduce the substantial numbers of offenders who are subsequently returned to incarceration due to drug use or drug-related crime. This could have a substantial impact on public safety.

---

[4] See in particular the research of James A. Inciardi of the University of Delaware, who has published extensively on the relationship between drug use and crime since the 1970s.

The BOP treatment model has demonstrated results. The three-year outcome report found that inmates who receive treatment are more likely to avoid new arrest or revocation and maintain employment.[5]

- **Vocational Training.** The Office of the D.C. State Superintendent of Education provides an HVAC training program funded with a Department of Education grant; however, the grant program limits participation to 18- to 24-year-olds. The University of the District of Columbia (UDC) recently launched a pilot program to provide vocational skills assessment and enhancement. Program participants are expected to continue their training at UDC after release. CSOSA worked with both UDC and Rivers to negotiate the Memorandum of Understanding that governs this program. These are very promising programs, but more training opportunities are needed.

While employment is clearly an important part of successful reentry, recent research indicates that getting and keeping a job are complex problems. The Urban Institute's longitudinal study of reentry, *Returning Home*, interviewed 400 Illinois prisoners before and up to three times after their release. The study identified a cluster of issues that had a negative impact on employment: negative peer influences, prior revocations, lack of intimate relationships, drug or alcohol use, and neighborhood drug selling. The ability to maintain employment was related to overall life success and stability. Although most employed respondents were satisfied with their jobs a year after release, their wages averaged only $9.60 per hour.[6]

In order to be as useful as possible to the offender preparing to re-enter the work force, vocational training should be linked to real job opportunities, equip the inmate with skills that are in demand, and incorporate training in techniques the offender can use to combat negative influences, attitudes, and habits. As with substance abuse treatment, the training experience should span the entire reentry experience, beginning in prison and following the offender into the community.

---

[5] Federal Bureau of Prisons. "BOP Triad Drug Treatment Evaluation Three-Year Outcome Report," 2005.
[6] Kachnowski, Vera. "Returning Home Illinois Policy Brief: Employment and Prisoner Reentry." Washington, DC: The Urban Institute, 2005.

CSOSA has been working with the GEO Group and the BOP to develop programs that provide the skills needed in the D.C. job market and to link these programs with local employers and trade unions. Such linkages will provide returning inmates with the opportunity for continued training and, with it, better long-term career prospects. At this time, we are working with the Carpenters Union to develop a union-approved carpentry training program modeled on the recently implemented program at California's Folsom State Prison. As in California, such a program could connect prison-based training with real post-release jobs. We hope this program will be the first of multiple successful efforts to bring vocational training to Rivers.

The Washington, D.C. area economy is primarily knowledge- and information-based. The D.C. Workforce Investment Council reported in 2005 that approximately 70 percent of area employment is in the Business Services sector (which encompasses information systems). Many D.C. offenders possess significant educational deficits; only about half of the offenders under supervision have a high school diploma or GED. However, those that do should have training opportunities in the areas where they are most likely to find a job.

BOP vocational programs range from under 100 hours to thousands of hours in duration and provide credentials ranging from a BOP certificate to Department of Labor-certified "apprentice" status. While it is difficult to define the capacity, duration, and content of programs that should be developed at Rivers, any development effort should take into account the average sentence served by Rivers inmates, which is 60 months. Based on the BOP's March 2005 "Occupational Training Programs Directory," a range of programs, including Business Technology (500 hours), Culinary Arts (1500 hours), and the Computer Technology apprenticeship (4,000 hours) might be considered in addition to an apprenticeship program in the building trades.

The BOP has developed a wide range of programs taught by full-time staff, adjunct instructors under contract, and through cooperative agreements with local colleges and trade schools. Each of these methods of program delivery should be considered for Rivers, which is located in a relatively isolated area.

6

- **Counseling and Life Skills Programs.** In addition to substance abuse, most inmates face significant behavior-based obstacles to successful reentry. Thirty-seven percent of offenders under CSOSA supervision self-report a mental health issue ranging from recurrent depression and anxiety to a serious personality disorder. In addition, inmates need help preparing for the stresses of reentry. Programs that help offenders manage situational stress and overcome ingrained errors of thinking, understanding, and behavior are just as necessary as job training or GED preparation; a recent Pennsylvania Department of Corrections study cites unrealistic expectations, anti-social attitudes and beliefs, and poor coping skills as the three most important underlying factors of parole violation.[7] Inmates often lack the social and behavioral skills necessary to maintain a job. They may have significant problems with anger, motivation, or communication. The offender is much less likely to succeed upon release if he carries with him the same flawed belief system and coping mechanisms that have served him so poorly in the past.

CSOSA has collaborated with Rivers staff since the summer of 2003 to augment their release preparation program through two video conference programs. The CSOSA/Faith Community Partnership implemented video mentoring to link inmates nearing release from Rivers with faith-based mentors who provide pre-release encouragement and post-release support. We have also developed Community Resource Day, a quarterly video conference to provide inmates nearing release with information from local government and non-profit service providers in the critical areas of housing, health care, education, and employment. Response to these programs has been very positive; however, they are just one element of a comprehensive release preparation program.

The Revitalization Act launched a new era in the administration of justice in Washington, DC. By assuming the cost of housing and post-release supervision for

---

[7] Pennsylvania Department of Corrections, "Research in Review, Special Issue: PA DOC's Parole Violator Study (Phase 2)." Harrisburg, PA: Pennsylvania Department of Corrections, December 2006.

7

D.C.'s inmate population, Congress also invested in their post-release success. To realize a return on that investment, we must ensure that D.C. inmates have access to the resources they need, both before and after their return to our city. I look forward to continuing to work with the BOP and our other partners to improve the programs available at Rivers and other institutions.

CONTRACT AWARD

| | | | |
|---|---|---|---|
| 1. CONTRACT NUMBER J005 | 2. EFFECTIVE DATE See Block 15c | 3. SOLICITATION NUMBER RFP PCC-0004 | 4. REQUISITION/PROJECT NUMBER 181 |

5. ISSUED BY    CODE  N/A

Federal Bureau of Prisons
320 First Street NW Room 5006
Washington, DC 20534
Scott P. Stermer, Contracting Officer
(OMB #1103-0018 EXP 02/28/01)

6. ADMINISTERED BY (if other than Item 5)    CODE  N/A

Same Block 5

**ORIGINAL**

7. NAME AND ADDRESS OF CONTRACTOR    CODE

Wackenhut Corrections Corporation
4200 Wackenhut Drive
Palm Beach Gardens, FL 33410

8. PAYMENT WILL BE MADE BY

Federal Bureau of Prisons
Mid-Atlantic Region
Junction Business Park
10010 Junction Drive, Suite 100-N
Annapolis Junction, MD 20701
Regional Comptroller

| 9A. DUNS NUMBER | 9B. TAXPAYER'S IDENTIFICATION NO. (b)(4) | 10. SUBMIT INVOICES (4 copies unless otherwise specified) TO [X] ITEM 5  [ ] ITEM 6  [ ] ITEM 8  [ ] OTHER (Specify) |
|---|---|---|

11. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | | X | I | CONTRACT CLAUSES | 11 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 3 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 4 | X | J | LIST OF ATTACHMENTS | 95 |
| X | D | PACKAGING AND MARKING | 40 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 1 | | | | |
| X | F | DELIVERIES OR PERFORMANCE | 4 | X | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | G | CONTRACT ADMINISTRATION DATA | 2 | | | | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 3 | X | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | 14 |
| | | | | | M | EVALUATION FACTORS FOR AWARD | |

12. DESCRIPTION

Contractor-Owned and Contractor-Operated correctional facility for an estimated population of 1,200 low security male District of Columbia (D.C.) sentenced felons.

13. TOTAL AMOUNT OF CONTRACT                                    591,890,622.95 (FP01009T120M)

**14. CONTRACTOR'S AGREEMENT.** Contractor agrees to furnish and deliver the items or perform services to the extent stated in this document for the consideration stated. The rights and obligations of the parties to this contract shall be subject to and governed by this document and any documents attached or incorporated by reference.

[X] A. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN FOUR COPIES TO THE ISSUING OFFICE. (Check if applicable)

B. SIGNATURE OF PERSON AUTHORIZED TO SIGN

C. NAME OF SIGNER

Wayne H. Calabrese

D. TITLE OF SIGNER

President

/22/2000

**15. AWARD.** The Government hereby accepts your offer on the solicitation identified in Item 3 above as reflected in this document. The rights and obligations of the parties to this contract shall be subject to and governed by this document and any documents attached or incorporated by reference.

A. UNITED STATES OF AMERICA (Signature of Contracting Officer)

B. NAME OF CONTRACTING OFFICER

Scott P. Stermer, Contracting Officer

C. DATE

3/7/2000

AUTHORIZED FOR LOCAL REPRODUCTION

OPTIONAL FORM 307 (9-97)
Prescribed by GSA - FAR (48 CFR) 53.215-1(c)

**EXHIBIT SEVEN**



*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

II.   EXPLANATION OF STATEMENT OF WORK TERMS . . . . . . . . . . 2

III.  OBJECTIVE . . . . . . . . . . . . . . . . . . . . . . . . . 5
      A.  Performance Requirements . . . . . . . . . . . . . . . 5
      B.  Contract Compliance . . . . . . . . . . . . . . . . . . 6
      C.  General Administration . . . . . . . . . . . . . . . . 7
      D.  Fiscal Management . . . . . . . . . . . . . . . . . . . 9
      E.  Personnel . . . . . . . . . . . . . . . . . . . . . . . 10
      F.  Training and Staff Development . . . . . . . . . . . . 17
      G.  Case Records . . . . . . . . . . . . . . . . . . . . . 19
      H.  Information Systems and Research . . . . . . . . . . . 19
      I.  Physical Plant . . . . . . . . . . . . . . . . . . . . 22
      J.  Security and Control . . . . . . . . . . . . . . . . . 25
      K.  Safety and Emergency Procedures . . . . . . . . . . . 29
      L.  Discipline . . . . . . . . . . . . . . . . . . . . . . 30
      M.  Inmate Rights . . . . . . . . . . . . . . . . . . . . . 30
      N.  Reception and Orientation . . . . . . . . . . . . . . . 31
      O.  Classification . . . . . . . . . . . . . . . . . . . . 32
      P.  Health/Mental Health Care . . . . . . . . . . . . . . . 32
      Q.  Social Services . . . . . . . . . . . . . . . . . . . . 36
      R.  Work and Correctional Industries . . . . . . . . . . . 36
      S.  Academic and Vocational Education . . . . . . . . . . . 37
      T.  Recreation and Activities . . . . . . . . . . . . . . . 38
      U.  Telephone . . . . . . . . . . . . . . . . . . . . . . . 38

*DISTRICT OF COLUMBIA SENTENCED FELON - Phase II - STATEMENT OF WORK*
*Request for Proposal PCC-0004*

1    I.    INTRODUCTION

2    The National Capital Revitalization and Self-Government
3    Improvement Act of 1997 mandates that the Bureau of Prisons house
4    a portion of the District of Columbia sentenced felon population
5    in private contract facilities.

6    The Bureau of Prisons has proceeded to comply with this mandate
7    by identifying the appropriate populations to fulfill the
8    requirement from the overall District of Columbia sentenced felon
9    population.

10   The attached SOW identifies the technical and programmatic
11   details for a low security adult male population.

1

1    Inmates shall not be used to perform the responsibilities or
2    duties of an employee of the contractor.  Appropriate safety/
3    protective clothing and equipment shall be provided to the inmate
4    population as appropriate.  Inmates shall not be assigned work
5    considered hazardous or dangerous.  This includes, but is not
6    limited to, areas or assignments requiring great heights, extreme
7    temperatures, use of toxic substances and unusual physical
8    demands.

9    As applicable, inmates shall be paid identical rates of pay as
10   those established by P.S. 5251.04, Inmate Work and Performance
11   Pay Program and 28 CFR 545.20.

12   8.  Academic and Vocational Education

13   The contractor shall develop an English-as-a-Second-Language
14   (ESL) program for limited English proficient inmates to improve
15   their oral and written English communication skills until the
16   inmate functions at the eighth grade equivalency level in
17   accordance with P.S. 5350.24, Section 6, English-as-a-Second
18   Language Program and as mandated by the Comprehensive Crime
19   Control Act of 1990.

20   The contractor shall ensure literacy programs and records are in
21   compliance with the Violent Crime Control and Law Enforcement Act
22   of 1994 and the Prison Litigation Reform Act of 1996 and are
23   consistent with procedures established by the BOP.

24   The contractor shall administer the Adult Basic Learning
25   Examination and the Spanish Assessment of Basic Education, Second
26   Edition, to measure eighth grade equivalency for all inmates for
27   proper program placement in accordance with P.S. 5310.15, Section
28   5a, Minimum Standards for Administration, Interpretation and Use
29   of Education Tests.

30   The contractor shall develop and make available to all inmate
31   education program which addresses the subject of sexual
32   assault/sexual abuse.  The content of the educational program
33   must include topics such as: recognizing behaviors that are
34   inappropriate, harassing, or assaultive; how to seek protection;
35   privacy rights; medical/psychological programs for victims of
36   abuse; how to make confidential reporting of sensitive issues to
37   institution staff, the BOP, or the OIG.  The contractor shall
38   augment the educational program by distributing informational

1    posters and pamphlets to the inmate population.

2    A comprehensive parenting education program to promote and build
3    family relationships shall be made available for voluntary
4    attendance by the inmate population.

5    The contractor shall provide General Education Development (GED)
6    testing by becoming a GED testing center through the GED Testing
7    Service or by securing GED testing services through a local
8    provider.

9    The contractor shall utilize the SENTRY Education Data System
10   (EDS) to enter the required information pertaining to individual
11   inmate participation and progress in the institution education
12   program.  The contractor is referred to the SENTRY Education TRM
13   as a guide to the use of the SENTRY EDS.

14   T.  Recreation and Activities

15   The contractor shall comply with Section 611 of P.L. 104-208,
16   Title I, Section 101(a)(the Zimmer Amendment), which addresses
     use of recreational equipment and materials by Federal inmates.

18   The contractor shall ensure that correctional staff are assigned
19   in sufficient numbers to supervise all inmate recreation
20   activities.

21   U.  Telephone

22   The contractor shall provide a telephone system for inmates
23   capable of accommodating both debit and collect phone calls.  The
24   contractor shall establish procedures that permit inmates to make
25   telephone calls, including in cases of emergency or inmate
26   indigence.

27   All inmates, with the exception of inmates in the Special Housing
28   Unit or Control Unit, shall be allowed a minimum of 120 minutes
29   of collect calling per month unless telephone privileges have
30   been suspended as part of a disciplinary sanction.

31   Inmates in the Special Housing Unit or Control Unit are entitled
32   to a minimum of one social call per month.

```
PAGE 001 OF 001 .            INMATE EDUCATION DATA                    05-  -.008
                               TRAN  RIPT                            09:  :11

REGISTER NO: 09565-007      NAME..: FOR  VER
FORMAT.....: TRANSCRIPT     RSP OF: RIV  ERS CI                   ETHIC: PPT

-------------------------- EDUCATION  RMATION --------------------------

FACL ASSIGNMENT DESCRIPTION
RIV  ESL HAS     ENGLISH PROFICIENT            START DATE TIME  STOP DATE TIME
RIV  GED HAS     COMPLETED GED OR HS DIPLOMA   09-17-2002 1 30  CURRENT
                                              09-17-2002 1 30  CURRENT

-------------------------- EDUCATION  OURSES --------------------------

SUB-FACL   DESCRIPTION                    START DATE   STOP DATE  EVNT AC LV  HRS

RIV        ADULT CONT EDU CORRESPONDENCE  10-01-2005 04-05-2006   P   C  P

RIV        PARENTING PROGRAM              11-06-2002 11-27-2002   P   C  P

RIV        ADULT CONT EDU CORRESPONDENCE  01-11-2005 06-24-2005   P   C  P

RIV        VOC COMPUTER TECHNOLOGY PM8    10-02-2003 08-22-2005   P   C  N   11

RIV        VOC COMPUTER TECHNOLOGY PM8    12-26-2002 04-08-2003   P   C  E

RIV        LIFE SKILLS PM 5              1-07-2002 12-24-2002    P   C  P

RIV        COMMERCIAL DRIVER PREP COURSE  10-26-2002 11-01-2002  P   C  P
```

**EXHIBIT EIGHT**

IN THE

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF COLUMBIA


CHARLES E. FORRESTER, JR.,

     Plaintiff,

v.                              Civil No. **06-1954(HHK)**

BUREAU OF PRISONS, **et al.**,

     Defendants.


## AFFIDAVIT OF CHARLES E. FORRESTER, JR.


Charles E. Forrester, Jr., being duly sworn, deposes and says:

1.  I am a District of Columbia Code offender currently confined at the Rivers Correctional Institution ("RCI") since September 12, 2002, pursuant to a contract between the Federal Bureau of Prisons ("BOP") and The GEO Group, Inc.

2.  This affidavit is made in support of my response in opposition to the Defendants' Supplemental Motion To Dismiss.

3.  I am currently scheduled to be released from confinement in 2011.

4.  During my incarceration at RCI, I have completed two Adult Continuing Education Correspondence courses, which are the Professional Paralegal Specialty Program: Civil Litigation, and the Professional Paralegal Program. See the attachments.

5.  I paid for the noted correspondence courses because the

- 1 -

EXHIBIT NINE

RCI staff would not assist me in obtaining funding for any college-level or correspondence programs.

6. The record in this civil action is silent regarding my completion of RCI's Woodworking progra. For the record, I swear that I did in fact complete RCI's Woodworking program. See Mr. Forrester's civil complaint at paragraphs 21-22.

7. Currently, there are absolutely no viable marketable vocational opportunities being offered to me by the BOP or RCI.

8. At this juncture, I am doing what is characterized as idle time while being housed at RCI.

9. If I am called to testify during a hearing in this civil action, I swear that I will testify truthfully and in a manner that is consistent with this affidavit.

10. I swear that this affidavit is not a sham, nor is it submitted in bad faith.

Date: 11/13/2007

/s/ _____

Charles E. Forrester, Jr.

Sworn to before me this
13th day of November 2007

_____
NOTARY PUBLIC

State of North Carolina, County of Pasquotank
Signed before me this 13th day of Nov, 2007
By Charles Forrester
My Commission Expires 4/1/09

_____
Rita C. Williams, Notary Public

- 2 -

# The School of Paralegal Studies

## PROFESSIONAL CAREER DEVELOPMENT INSTITUTE

In recognition of completion of the Prescribed Course

### The Professional Paralegal Specialty Program: Civil Litigation

this Diploma is hereby awarded to

*Charles Edward Forrester, Jr.*

In testimony whereof, this Diploma has been conferred in Atlanta, Georgia whereupon the undersigned have affixed their names on this day

*April 5, 2006*



President,
Professional Career
Development Institute

Director of
Education

# The School of Paralegal Studies

## PROFESSIONAL CAREER DEVELOPMENT INSTITUTE

In recognition of completion of the Prescribed Course

### The Professional Paralegal Program

this Diploma is hereby awarded to

*Charles Edward Forrester, Jr.*

In testimony whereof, this Diploma has been conferred in Atlanta, Georgia whereupon the undersigned have affixed their names on this day

*June 23, 2005*



Director of
Education





President,
Professional Career
Development Institute

