RECEIVED

NOV 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF COLUMBIA


CHARLES E. FORRESTER, JR.,
        Plaintiff,


v.                                    Civil No. **06-1954(HHK)**


BUREAU OF PRISONS, <u>et</u> <u>al</u>.,
        Defendants.


<u>PLAINTIFF'S MOTION REQUESTING THE COURT
TO TAKE JUDICIAL NOTICE OF SPECIFIC FACTS
IN ACCORDANCE WITH TITLE 28 U.S.C. § 201
(JUDICIAL NOTICE OF ADJUDICATIVE FACTS)</u>


**Comes now** the Plaintiff, Charles E. Forrester, Jr., moving
**pro** **se**, and hereby respectfully moves this Court to take judicial
notice of the statements and testimony before a Congressional Com-
mittee on October 16, 2007, and a related article from the Washing-
ton Post newspaper of October 17, 2007——which are attached as exhi-
bits two, three, four, five, and six to Plaintiff's Response In
Opposition To The Defendants' Supplemental Motion To Dismiss of
November 13, 2007.  This request is submitted to the Court pursuant
to Title 28 U.S.C. § 201 (2001).  In support of this motion, Plain-
tiff asserts the following:


- 1 -

1.  In accordance with the Court's November 5, 2007 order, Plaintiff submitted his November 13, 2007 Response in Opposition To The Defendants' Supplemental Motion To Dismiss.

2.  Attached to Plaintiff's opposition are Exhibit two, Washington Post article of  October 17, 2007; Exhibit three, Statement of Chairman Danny K. Davis of October 16, 2007; Exhibit four, the testimony of George E. Snyder of October 16, 2007; Exhibit five, Statement of Harley G. Lappin of October 16, 2007; and Exhibit six, Statement of Paul A. Quander of October 16, 2007.[1] See id. See chiefly, U.S. ex rel Dingle v. Bioport, 270 F.Supp.2d 968, 972 (W.D. Mich. 2003).

3.  The noted exhibits are extremely relevant to Plaintiff's remaining claim. See Plaintiff's opposition at pages 3 through 6. Thus, in accordance with Title 28 U.S.C. § 201, Plaintiff hereby moves the Court to take judicial notice of the noted Washington Post article, along with the statements and testimony. See Covad Comms. Co. v. Bell Atlantic Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005) (permitting judicial notice of facts in public records of other proceedings); U.S. ex rel Dingle v. Bioport, 270 F.Supp.2d 968, 972 (W.D.

---

[1] The Court, and all parties relevant to this litigation, are apprised that the attached exhibits and their assigned numbers are identical to the exhibits that are affixed to Plaintiff's opposition. McNamara v. National Credit Union Ass'n, 264 F.Supp.2d 1, 4 (D.D.C. 2002) (courts are to grant pro se litigants more latitude in procedural matters); Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

Mich. 2003) (same); <u>Adarand Constructions Inc. v. Slater</u>, 228 F.3d 1147, 1168-69, and n.12 (10th Cir. 2000) (same).

**4.** Within the Court's November 5, 2007 order, Plaintiff was directed to "respond to defendants' supplemental motion to dismiss by **December 11, 2007**". <u>See</u> <u>id</u>. Thus, the Court is requested to consider this instant motion as timely.

**5.** The Defendants will not suffer any prejudice if the Court grants Plaintiff's timely motion pursuant to 28 U.S.C. § 201. <u>See</u> Plaintiff's opposition, pg. <u>3</u>, paragraph <u>2</u>.

For the reasons asserted above, Plaintiff hereby respectfully moves the Court to take judicial notice of the items outlined **<u>supra</u>**, paragraph <u>2</u>. <u>See</u> 28 U.S.C. § 201(d). <u>See also</u> <u>U.S. v. Neil</u>, 964 F.Supp. 438, 445, n.8 (D.D.C. 1997).

Respectfully submitted,

November 27, 2007    /s/ _Charles E. Forrester, Jr._

Charles E. Forrester, Jr.
Fed. Reg. No. 09565-007
Rivers Correctional Institution
P.O.Box 630 / Unit C
Winton NC 27986-0630

- 3 -

## CERTIFICATE OF SERVICE

This is to certify that I have this 27th day of November 2007 served a copy of the foregoing motion upon the below-listed party by placing the same in the Rivers Correctional Institution prison mailbox, addressed as follows:

> Blanche L. Bruce
> Assistant United States Attorney
> 555 Fourth Street, N.W.
> Room E-4220
> Washington DC  20530

/s/ _____
Charles E. Forrester, Jr.
pro se

- 4 -

Changes Pledged At N.C. Prison

# washingtonpost.com

## Changes Pledged At N.C. Prison

D.C. Concerns Aired at Hearing

By Robert E. Pierre
Washington Post Staff Writer
Wednesday, October 17, 2007; B01

The private North Carolina prison where about 1,000 D.C. inmates are held, the most in any single place nationwide, has substandard drug treatment and vocational training programs compared with most federal facilities, the U.S. Bureau of Prisons said yesterday.

Harley G. Lappin, the bureau's director, said he is revising the federal government's contract with the Rivers Correctional Institution to make the facility "mirror as close as we can the programs offered in other prisons."

The acknowledgment came after years of complaints from inmates, their families and prisoner advocates about Rivers, which is about 200 miles from the District in Winton, N.C. Lappin promised the changes during a hearing convened by Del. Eleanor Holmes Norton (D-D.C.), who has been pressing the Bureau of Prisons to make reforms.

Norton has contended in recent months that the 7,000 D.C. inmates in 75 institutions nationwide get "second-class" treatment compared with the rest of the 200,000 inmates under federal control. She recently visited Rivers and a federally run prison in Cumberland, Md., to compare the way inmates are treated. Activities at the two places were as different as night and day, she said.

At Rivers, Norton said, inmates had too much unproductive free time. At Cumberland, programming was more organized, with inmates shuttling from one event to the next.

D.C. inmates at Rivers are held alongside immigrants who have committed crimes and are serving their time before being deported to their home countries. Those inmates often are not offered the same programs in prison as U.S. citizens.

"If you're a District resident, you get tired of not having rights, even when you go to jail," said Norton, who at times grew testy with prison officials.

Nonviolent federal offenders get a year off their sentences if they complete a 500-hour drug treatment program.



SHOW US YOUR
WISH LIST OPTIONS

CARUSO







EXHIBIT TWO

But prisoners serving time for D.C. offenses get no such consideration, even though the D.C. government passed a law two years ago that said they deserved the time off, Lappin said he expected the disparity to be changed soon.

The congressional hearing was the first in the decade since the District asked the federal government to assume control of its prisoners. Norton said the scrutiny was long overdue because inmates were hundreds or thousands of miles away, out of sight and out of mind of most residents.

But their families never forgot that their loved ones, once sequestered at the Lorton prison complex in Northern Virginia, needed more attention. Hundreds, in fact, showed up at a recent meeting to voice their concerns.

Yesterday, two former inmates appeared on Capitol Hill.

Douglas Robinson, 52, has been incarcerated for 16 years, 11 at Lorton and the rest in Bureau of Prisons facilities. At two of the institutions, he said, he often could not enter programs he wanted because they were full or canceled. But he credited a 500-hour drug treatment program at Butner Federal Correctional Institution in North Carolina with helping to save his life.

"For so long, I had ducked and dodged that I had a problem," he said. "I learned that my behavior was causing my problem. When I arrived home, I made a choice to move on with my life." Out for six months, he now works at Goodwill Industries, stocking trucks.

Kev in Barnes, 30, served three years at Rivers. The library was cramped and contained few books, he said. The focus instead was athletics, and the majority of inmates spent their time playing basketball, football and other sports.

"That's not going to help an inmate when they come home," said Barnes, who said he now works as an electrician.

The GEO Group, a company that runs 68 correctional and residential treatment facilities worldwide, owns and operates Rivers. The prison's warden, George Snyder, defended the institution in testimony yesterday, saying that there are plenty of classes, in such areas as anger management and computer skills, available for inmates. As a career prison official, Snyder said, he is committed to providing even better programs.

Lappin agreed that programming is only part of the problem.

"You've got to have a willing participant," he said. "It's not a one-sided formula. We do not force inmates into programs, except all prisoners who are medically cleared will work. We counsel, we push for educational training. . . . Some offenders just don't see the light."

The hearing was held before a subcommittee of the Committee on Oversight and Government Reform, and Rep. Danny K. Davis (D-Ill.) said the prisoner problems are an issue all over the nation.

Changes Pledged At N.Y. Prison

"Many of these ex-offenders are returning to their communities unprepared and without the support they need to sustain their new lives," said Davis, chairman of the subcommittee on the federal workforce, Postal Service and the District of Columbia. "Without structure and support to help ensure a lasting transition, we are unwittingly creating a revolving door for former inmates."

Post a Comment

View all comments

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

Ads by Google

5 Blade Razors
First Of Its Kind. Gillette & The Art Of Shaving Power Razor w/light.

© 2007 The Washington Post Company



# Congresswoman
# ELEANOR HOLMES
# NORTON
### District of Columbia

**For Immediate Release**
August 14, 2007

Contact: Julia Hudson
(202) 225-8050
Julia.Hudson@mail.house.gov
Web Site: http://www.norton.house.gov

### Norton's Eye Opening Visit To Rivers Correctional Institution Underscores Need for Inmate Substance Abuse Treatment and Many Other Services
### Hearings in September

Washington, DC-- Congresswoman Eleanor Holmes Norton (D-DC), in the first visit by a D.C. elected official to Rivers Correctional Institution, assured D.C. inmates that with the change in the control of Congress, oversight has begun and that she is working to make sure that Rivers inmates have access to the same programs as others at Bureau of Prisons (BOP) facilities around the country. With clear signs of increase in crime in D.C., Norton told Warden George E. Snyder and Rivers and BOP personnel that her first priority is increasing substance abuse treatment. A limited, non-certified program is available only to 60 of the 1,355 inmates, although 50 to 80 percent have substance abuse problems. "The reported 65% recidivism rate can be traced back largely to putting men on the streets with no money, no plan for the future, and an unresolved drug habit," Norton said. Inmates in many BOP facilities get early release incentives upon completion of a 500 hour drug treatment program, which is unavailable at Rivers. Thus, D.C. prisoners have less encouragement to enroll in the program (although the Rivers program has a waiting list), and get far less effective drug treatment, if any, before coming back to D.C. "I told the inmates that providing substance abuse treatment that works is my first priority," she said, "to assure that they break the habit that got most of them there and to relieve the burden none of them wants to put on their family, friends and the city."

Norton toured the health and dental care units, GED and life skills classes, the cafeteria, kitchen, commissary, and programs that included woodworking with a focus on cabinet making and computer classes. She had access to all parts of the facility and spoke with individuals and groups of inmates at will in the yard, in their living quarters, and in the halls of the institution. Many felt free to stop Norton and have discussions or air complaints that ranged from the size of the gratuity once released to the need for the same programs at Rivers as at other BOP facilities.

A Rivers official told the Congresswoman and her staff that the level of education for many D.C. inmates at Rivers is high and often above high school level, but there are no higher education programs for these individuals. Norton will seek discussions with the University of the District of Columbia concerning providing college correspondence courses. The D.C. Office of the State Superintendent of Education also provides a federally financed program for inmates aged 19 to 26 to receive Heating, Ventilation, and Air Conditioning (HVAC) training through the local community college, Roanoke-Chowan Community College.

**(More)**

The Norton visit begins a much longer investigation and oversight of D.C. inmates and facilities. Because law enforcement agencies, including prisons and courts, are now 100% federally funded, D.C. no longer has jurisdiction to do the requisite oversight to make improvements. "The buck literally has been passed to the federal government, and with it, the responsibility. It is time Congress assumed the oversight responsibility that goes with the funding." However, Norton is concerned to get more formal D.C. involvement, especially in seeking untapped available federal funding, and with reentry.

Norton has said that D.C. inmates are treated as second class citizens by BOP, but she says the major blame belongs with Congress, which has provided no oversight since the transfer in 1997 and inadequate funding. Norton told the inmates she visited with yesterday, "I am here to do my part to get the necessary funds so that inmates from the District of Columbia receive the same services prisoners across the country receive from the Bureau of Prisons." However, she also told the inmates that the city wants them to do their part to stay clean and out of jail.

The Congresswoman will hold a series of hearings focused on Rivers. The first will be a teleconference between the Black Men and Boys Commission and Rivers inmates, and an official hearing to be held September 18th will focus on transition services and community supervision. Norton will continue to pursue equal treatment of District inmates as she looks into how the 7,000 D.C. residents scattered across the country are housed and how to bring them closer to home. She also will visit BOP prisons in the coming month. She is concerned that lack of family contacts and difficulty accessing services in the community, coupled with lack of substance abuse treatment, exacerbates the difficulties the District and the inmates have in effectively integrating these residents back into the community.

Rivers, originally built as a 1,200 bed facility, currently houses 1,355 inmates and has an expanded inmate capacity of 1,380 inmates as of August 13, 2007. District of Columbia residents make up approximately 65% of the total inmate population, with the other 35% comprised of criminal immigrants from various areas. No other citizen inmates are housed in private facilities. The average incarceration time in this low security facility is less than two years. The average age of the inmates is 40 years old, necessitating more health care than normal. A healthcare lawsuit is being brought by the Washington Lawyer's Committee for Civil Rights and Urban Affairs' D.C. Prisoners' Project.

###

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
   DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

TOM DAVIS, VIRGINIA,
   RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

Majority  (202) 225-5051
Facsimile  (202) 225-4784
Minority  (202) 225-5074
TTY  (202) 225-6852

http://oversight.house.gov

## STATEMENT OF CHAIRMAN DANNY K. DAVIS
## AT THE SUBCOMMITTEE ON FEDERAL WORKFORCE,
## POSTAL SERVICE AND THE DISTRICT OF COLUMBIA

### HEARING ON

### "Doing Time: Are DC Prisoners Being Adequately Prepared for Reentry with Equal Access to BOP Services?"

#### October 16, 2007

Good afternoon, welcome to today's hearing to examine the rehabilitative services at Rivers Correctional Institution (RCI), a privately-run Federal Bureau of Prisons (BOP) facility housing D.C. inmates and foreign-born residents. There are two million Americans in prisons in the United States. Each year, more than 650,000 ex-offenders released from state and federal prisons will return to civilian life. These men and women deserve a second chance to break the grip of a drug habit, a chance to support a family, to pay taxes, and to be self-sufficient. Many of these ex-offenders return to their communities unprepared and without the support they need to sustain their new lives.

This is why I have sponsored H.R. 1593, the "Second Chance Act"; it is a bipartisan bill that addresses reentry reform with a comprehensive approach to help eliminate barriers and increase access to transitional services for ex-offenders. A third of all correction departments provide zero services to released ex-offenders, and most do not offer a transitional program, thereby, placing a heavy burden on families and communities. Without structure and support to help ensure a lasting transition, we are unwittingly creating a revolving door for former inmates. These individuals pay a price, as do their families, and society.    **EXHIBIT THREE**

Ex-offenders face many barriers that impede their return to society, which include: serious physical and mental health problems, homelessness, and lack of education or minimal qualifications to hold a job. As a result, two out of three ex-offenders will be rearrested for new crimes within the first three years after their release. This hearing will help shed light on the importance of transitional services for ex-offenders not only in the District of Columbia, but across the country. Currently, 7,000 District inmates under federal jurisdiction are spread across 75 institutions and 33 states. Since the passage of the National Capital Revitalization and Self-Government Improvement Act of 1997 Congress has not conducted any hearings into BOP's management of DC prisoners.

My colleague, Delegate Eleanor Holmes Norton has been to Rivers Correctional Institution, in Winton, North Carolina, and the Federal Prison Institution in Cumberland, Maryland. She spoke to inmates and prison officials at both institutions. I commend her for her efforts to learn more about the educational and transitional services offered to DC inmates at BOP facilities.

Thank you and I look forward to hearing from today's witnesses.



**The GEO Group, Inc.**

Written Testimony Of

George E. Snyder, Warden

Rivers Correctional Institution


Before


The House Committee On Oversight And Government Reform
Subcommittee On The Federal Workforce, Postal Service, And The
District of Columbia


Regarding


Program Offerings At Rivers Correctional Institution


EXHIBIT FOUR

**Chairman Davis and Distinguished Members of the Subcommittee:**

My name is George Snyder, Warden of Rivers Correctional Institution, Winton, North Carolina. On behalf of The GEO Group, Inc., I thank you for the opportunity to testify today regarding the various programs offered to inmates housed in our facility.

Let me first, though, provide you with an overview of our company and the history of how Rivers Correctional Institution came into existence.

The GEO Group, Inc. is a world leader in the delivery of correctional, detention, and residential treatment services to federal, state, and local governmental agencies around the globe. GEO offers a turnkey approach that includes design, construction, financing, and operations. GEO represents government clients in the United States, Australia, South Africa, Canada, and the United Kingdom. GEO's worldwide operations include 68 correctional and residential treatment facilities with a total design capacity of approximately 59,000 beds.

The National Capital Revitalization Act of 1997 mandated that the Bureau of Prisons house a portion of District of Columbia, sentenced felons in private contract facilities. The BOP subsequently adopted a course of action that included soliciting bids for contract facilities, closing the existing Lorton, Virginia facility, and transferring inmates to contracted facilities.

On March 7, 2000, the BOP signed a contract with The GEO Group, Inc. to design, build, finance, own, operate and manage a low security, adult male facility in Winton, North Carolina. We received our first DC inmates in March of 2001. Located on a 257-acre tract in rural Hertford County, the facility is a campus design with four housing buildings, indoor and outdoor recreational areas, a central programs building, a prison industries building, and an administrative building. The design enables cost-effective utilization of security staff supplemented by modern electronic surveillance, which in turn allows enhanced programmatic activities without significant budgetary implications. Our average inmate population is 1350, with approximately 54 percent of the inmates coming from the District of Columbia. Rivers Correctional Institution is 226 miles from Washington, D.C.

The facility is accredited by the American Correctional Association and the Joint Commission on Accreditation of Healthcare Organizations.

# RIVERS CORRECTIONAL INSTITUTION PROGRAMS

**Psychology Department:**

All inmates admitted to the institution are provided an initial assessment by psychology staff. During this assessment, it is determined if an inmate is in need of additional psychological services, to include individual counseling, group counseling, substance abuse counseling, and/or psychiatric services. Currently, approximately 55 inmates are prescribed psychotropic

medication for a variety of mental illnesses from depression to schizophrenia.

At any given time, approximately sixty inmates are receiving regular bi-weekly to monthly individual counseling sessions, focusing on topics including problem-solving, conflict resolution, parenting skills, bereavement, victim empathy, relationship difficulties, and sex offender treatment.

A variety of staff and inmate-facilitated groups are offered, including Anger Management, Stress Management, and Doing Time with the Right Mind (DTRM), a Therapeutic Film Group, and a Fathers Support Group. DTRM is a 9-week, inmate-facilitated program that emphasizes improving communication between staff and inmates. It also helps inmates to use their time in prison wisely to better prepare themselves for release. The Therapeutic Film Group uses the themes of contemporary films as a therapeutic tool to illicit emotions and provide a foundation on which to discuss these emotions and other related issues. The Fathers Support Group is an ongoing self-help group that focuses on improving parenting skills.

Over the course of the past six months, 42 inmates have participated in the Anger Management Group, 6 inmates have successfully completed the Stress Management Group, and 32 inmates have participated in the Therapeutic Film Group. In April and August 2007, graduations for the DTRM Program were held with a combined total of 108 inmates graduating and receiving certificates of completion. Currently, 60 inmates are participating in DTRM, and 13 in the Fathers Support Group.

Additional services provided by psychology staff include, but are not limited to, crisis intervention, suicide assessments, psychiatric referrals, ongoing mental status assessments in the Special Housing Unit (SHU), psychological evaluations for US Parole Commission, and marriage evaluations.

**New Beginning Drug Treatment Program:**

RCI offers a nine-month residential drug treatment program that provides a continuum of treatment services to inmates with a documented history of substance abuse problems. The philosophy of the program holds that both substance abuse and recovery have a cause, a course, and a predictable outcome. This comprehensive program is conducted within a highly structured regimen of a modified therapeutic community composed of inmates with similar problems living and working together, elements critical to building a sense of community and cohesiveness among participants and staff, and promoting conformity and compliance with program rules and philosophy. Drug treatment staff are also based in the inmate housing unit in order to further the sense of community and cohesiveness.

The program has three phases of treatment:

Phase I – Orientation: Designed to acquaint the new inmate with the basic concepts of the therapeutic community and chemical dependency treatment. The inmate begins to participate in the development of an individual treatment plan, setting goals and accepting responsibility for his own behavior.

Phase II – Main Treatment: Focuses on the exploration of chemical dependency and associ... recovery issues. The inmate continues the process of self-examination and works toward developing positive attitudes and behaviors.

Phase III – Re-entry: Provides a period for solidifying new behaviors and attitudes into lasting habits, which will support this lifelong process of recovery. The inmate develops relapse prevention and aftercare plans, addressing all areas of his life, i.e., family, employment, housing, individual recovery, and use of community resources.

Throughout participation in the program, inmates are required to participate in weekly NA/AA meetings. These meetings may be facilitated by staff, inmates, or outside volunteers.

After completing the program, inmates are provided with an opportunity to continue their involvement in treatment through the Aftercare Program. Participation in weekly aftercare meetings provides a forum for inmates to practice skills acquired during treatment and prevents inmates from slowly returning back to old behavior patterns.

The program can accommodate 57 inmates in active treatment, with three additional inmates serving in the role as "cadre." Cadre inmates have completed treatment and are assigned as counselor aides, performing duties such as lectures and group facilitation. Since the program's inception in 2003, 155 inmates have completed the nine-month program.

Participation in the RCI residential drug treatment program does not preclude transfer of an inmate to a BOP facility for participation in the BOP 500-hour drug treatment program.

**40-Hour Substance Abuse Education:** This program provides inmates with information on alcohol and drugs as well as the physical, social and psychological impact of these substances. The course is considered a prerequisite for the therapeutic drug program.

Participation in the program is mandatory if: there is evidence in the Pre-Sentence Investigation that alcohol or other drug use contributed to the commission of the instance offense; alcohol or other drug use was a reason for violation of supervised release, including parole or Residential Re-entry Center placement for which the inmate is now incarcerated; or the inmate was recommended for drug programming during incarceration by the sentencing judge.

Inmates who are not required to participate in the program may request to participate voluntarily. Unit and psychology staff also recommends participation.

**Community Resource Day:**

Court Services and Offender Supervision Agency (CSOSA) is a federal agency providing supervision of adults on probation, parole and supervised release in the District of Columbia. Once a quarter CSOSA joins RCI in presenting a Community Resource Day in an effort to assist inmates with release preparation and transition planning via videoconference or in person.

4

Groups of over 200 D.C. inmates due to be released within 90 days participate in each resource day.

There are two basic elements of the program: During the morning segment the U.S. Parole Commission staff cover conditions of parole and supervised release; a representative from Hope Village Residential Reentry Center covers rules and responsibilities tied to halfway house residency; CSOSA's Community Supervision Officers explain how they conduct home plan investigations as well as the requirements of community supervision. A representative from Child Support Services Division of the Office of the D.C. Attorney General explains their enforcement policies and the benefits of compliance. The afternoon segment focuses on the critical areas of employment, education, health care and housing.

**Hope House DC Programs:**

Hope House DC was founded to serve the needs of DC inmates by offering programs to keep inmates and their families connected.

**Father-to-Child Reading Program:** Inmate fathers participating in this program are provided a children's book and audio or videotape; the inmate then records the book for his children. The book and the tape are mailed to the child. Parents and caregivers report that children not only enthusiastically listen to the recording, but do so repeatedly, reliving the experience of their father telling them a story.

**Father-to-Child Teleconference Program:** Children are brought to the D.C. Hope House where they may visit with their fathers face-to-face through a live teleconference hookup.

**Father to Child Summer Camp:** One week each summer, children from the D.C. area attend day camp with their fathers at RCI. Hope House staff and camp counselors guide the campers through crafts, drama, games, creative writing and other activities designed to help parent and child reconnect and strengthen the parent-child relationship. In the evening the children and counselors retreat to a local campground where they participate in crafts and recreation.

**Video Mentoring Program:**

A 1997 study showed that in the District of Columbia, one in two African American men ages 18 to 35 were under some form of correctional supervision. Given those statistics, and with an estimated 2,500 inmates returning to the District this year alone, law enforcement and church groups have set up a pilot mentoring program that involves church volunteers. The program pairs inmates with personal mentors to help them navigate the first difficult months out of incarceration, where everything from applying for a driver's license to navigating the Metro can be a frustrating challenge.

Run by the Court Services and Offender Supervision Agency (CSOSA), and a faith-based advisory committee chaired by the Rev. Donald Isaac, Associate Pastor of Southeast Tabernacle Baptist Church, Washington, D.C., this year-old program has so far matched about 100 inmates

and mentors. The idea is to focus intense attention on each inmate in the hope that none returns to drug use or other criminal habits once released.

Agency officers screen inmates still in prison who have volunteered for the program. The inmate/mentor pairs then meet and talk, in person or on the phone, developing a relationship that might last into the future.

**Education Programs:** Approximately 32 percent of the inmate population participates in either vocational or academic programs. Average monthly enrollment for academic education is 261, vocational education 101, and Life Skills 85.

Academic Programs include: English as a second language, adult basic education, pre-GED, and GED, and life skills/parenting. In 2007, 49 students received their General Equivalent Diploma and five students graduated from the English as a Second Language program.

> **English as a Second Language (ESL):** Instruction is provided to non-English speaking and English speaking persons who are not fluent in the English language. Classes focus on survival language skills. The program is designed to enable inmates to function at the equivalent of an eighth grade level of education.

> **Adult Basic Education (ABE):** Designed primarily for adults whose basic skills are below the ninth grade level, ABE classes focus on helping adults function more effectively in today's technological world by improving their reading, writing and math skills. Graduates of this program are encouraged to continue studies in the Pre-General Education Development program.

> **Pre-General Equivalent Diploma (GED):** This course is designed for students who comprehend on or at least a fifth grade level. Students are guided through an individualized process by the instructor and given a six-part examination comprised of all core curriculum courses (Science, Social Studies, Mathematics, Literature and Arts, and Writing Skills). Graduates are encouraged to continue studies in the GED program.

> **General Equivalent Diploma (GED):** This course is offered as a means for adults with educational skills at the high school level to earn the equivalent of a high school diploma. In preparation for the GED Exam, students are guided through an individualized study process and given GED practice tests. Roanoke Chowan Community College, Ahoskie, North Carolina, administers the official GED examination. If he passes, the graduate receives a High School Diploma Equivalency Certificate from the North Carolina Community College System.

> **Life Skills/Parenting:** The Life Skills program focuses on providing students with direction in dealing with many everyday life situations that they may encounter upon release. Students are taught to understand and build their self-esteem while learning to understand other people. They learn procedures for securing a driver's license, how to write checks, financial budgeting, the importance of maintaining a job, how to submit

resumes and apply for jobs. Parenting focuses on providing parent education in the areas of positive relationships, family values, mutual support and nurturing.

Vocational Programs includes computer technology, woodworking, heating and air conditioning, workforce transition, workforce transition, Corrections Learning Network, and Wheels for the World.

**Keyboarding:** This course is designed to teach basic keying skills and procedures. Emphasis is placed on the daily use of a computer system to develop skills with concentrated application of these skills to the production of business correspondence.

**Computer Technology I and II:** These programs are designed to teach students more than just document preparation. Desktop publishing is a component of this course that teaches the students to produce documents that are more creative, fun and effective in communicating messages. The student learns skills necessary for writing newsletters, creating styles, outlines, tables and tables of content. Students learn desktop features and design tips that help them to use art and color and use the drawing toolbar to create original artwork for their documents. Students are taught how to prepare basic worksheets, and to design, create, retrieve and enhance slides.

**Woodworking:** In a woodshop setting, the woodworking program focuses on transferable skills and stresses understanding and demonstration of the following elements of woodworking: planning, technical and product skills, health and safety and environmental issues, concepts of residential framing, residential planning and design and building code requirements. The student has hands-on instruction in the use of hand tools, operating portable power tools and stationary power woodworking machines.

**Heating, Ventilation and Air Conditioning (HVAC):** In this course students are introduced to the basic refrigeration process used in mechanical refrigeration and air conditioning systems. It covers the requirements for EPA certification and examinations and introduces common business and customer relation practices that may be encountered in HVAC. Some topics include terminology, safety, identification and function of components, refrigeration cycle, tools, instrumentation used in mechanical refrigeration systems, small appliances, and high and low pressure systems. Upon completion students should be able to identify refrigeration systems and components, explain the refrigeration process, use the tools and instrumentation of the trade, demonstrate knowledge of refrigerants, and be prepared for the EPA certification examination, present themselves to customers in a professional manner, understand how the business operates, complete invoices, and handle complaints.

**Workforce Transition:** A joint program conducted by the University of the District of Columbia, the Court Services and Offenders Agency and Rivers Correctional Institution staff, the program is a work-readiness program that prepares the individual inmates for resources and actions dedicated to addressing workforce needs and marketable skills. The training workshops include resume assistance, certifications, professional development, interview techniques, educational referrals and the basic job-hunting skills.

7

**Corrections Learning Network (CLN):**  The CLN program is a distance learning initiative administered by the Educational Service District 101 and funded through a Star School Grant from the U.S. Department of Education.  The Education Service District provides the RCI Educational Department with DVD's to enhance our Life Skills/Parenting, Release Preparation Program, and our Literacy programs.   DVD Resource topics include, but are not limited to:

| | |
|---|---|
| Work Performance | GED Math |
| Problem Solving | Science |
| Workplace Communication | Language Arts, Writing and Reading |
| Lifestyle & Wellness | |

**Wheels for the World:**  Wheels for the world Program, founded by Joni and Friends, is a nonprofit organization located in Agoura Hills, California.  Wheels for the world collects donated wheelchairs from across the United States through an organization called Chair Corps Organization.  Volunteers collect, store and transport wheelchairs to and from various prisons participating in the program.

Rivers Correctional Institution began participating in the Wheels for the World Program in August of 2007.  The program assists inmates in developing the necessary skills to master the basic concepts of wheelchair repair, including wheelchair identification, design, purpose and tool identification.  15 inmates are currently assigned to refurbish and repair wheelchairs.  A total of 63 chairs have been repaired and ready for distribution.

**Conclusion:**  Mr. Chairman, let me conclude by emphasizing that we at Rivers Correctional Institute are committed to providing inmates in our care with treatment and training programs that help them become productive and responsible members of their community upon release.  I appreciate the subcommittee's interest in this important issue, and I am happy to answer any questions the subcommittee members may have.

8



# Department of Justice

STATEMENT
OF
HARLEY G. LAPPIN
DIRECTOR
FEDERAL BUREAU OF PRISONS


BEFORE THE
FEDERAL WORKFORCE, POSTAL SERVICE, AND
THE DISTRICT OF COLUMBIA SUBCOMMITTEE
OF THE
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

U.S. HOUSE OF REPRESENTATIVES




CONCERNING

INMATE PROGRAMS AT RIVERS CORRECTIONAL INSTITUTION




PRESENTED ON

OCTOBER 16, 2007




EXHIBIT FIVE

Statement of Harley G. Lappin
Director, Federal Bureau of Prisons
Before the Federal Workforce, Postal Service, and
the District of Columbia Subcommittee
of the
Committee on Oversight and Government Reform
U.S. House of Representatives
October 16, 2007

Good Morning Chairman Davis and Members of the Subcommittee.

I appreciate the opportunity to appear before you today to discuss the role of the Bureau of Prisons in the confinement, care, and treatment of offenders from the District of Columbia.

The Bureau of Prisons (BOP) is responsible for the care and custody of more than 200,000 inmates in 114 Federal institutions and a number of contract facilities throughout the United States. We are responsible for the incarceration of inmates who have been sentenced to imprisonment for Federal crimes and the detention of individuals awaiting trial or sentencing in Federal court.  In addition, based on a 1997 Federal law, our agency is also responsible for the District of Columbia's sentenced felon inmate population.

The National Capital Revitalization and Self-Government Improvement Act of 1997 (Title XI of the Balanced Budget Act of 1997 (P.L. 105-33)) required the BOP to assume responsibility for the incarceration of District of Columbia (D.C.) sentenced felons

2

by December 31, 2001. The law also requires us to treat D.C.
Superior Court inmates as much like Federal inmates as possible,
stating: "Such persons shall be subject to any law or regulation
applicable to persons committed for violations of laws of the
United States consistent with the sentence imposed."

Immediately after passage of the Act, the BOP began working with
the D.C. Department of Corrections to ensure that the transfer of
inmates would be orderly and efficient. Our ambitious
construction schedule and our use of some State correctional
institutions and some privately-operated facilities allowed us to
meet the Act's requirement prior to the deadline; the transfer
was completed in November 2001.

The Act further required the BOP to house at least 2,000 D.C.
sentenced felons in privately-operated facilities by December 31,
1999, and to confine 50 percent of D.C. sentenced felons in
private facilities by September 30, 2003.

The privatization requirements of this Act were superceded by a
provision in Public Law 106-553 (enacted on December 21, 2000)
which provides that, beginning in fiscal year 2001 and
thereafter, the BOP may confine in privately-operated prisons
only those D.C. inmates who are determined to be appropriate for

such placement based on Federal classification standards and any
threat they may pose to public safety.

After the Revitalization Act passed in 1997, we initiated a
process to procure private contract beds as required by the
statute.  We divided the procurement into two phases for two
separate contract facilities.  The first phase of the procurement
resulted in a 1999 contract award for a facility in Philipsburg,
Pennsylvania.  Originally, the facility was slated to confine and
manage 300 female D.C. inmates of various security levels, 350
minimum-security male D.C. inmates, and 350 D.C. Youth Reform Act
inmates of various security levels.  The contract experienced
some delays due to environmental and legal challenges.  We
reassessed our needs and our decision regarding the population
that would be confined at the Philipsburg facility.  We
determined that the population should consist of 1,300 low-
security male inmates -- primarily low-security Federal criminal
aliens and D.C. inmates.  Construction of the Moshannon Valley
Correctional Center began in October 2004, and the facility
opened in April 2006.

The second phase of the procurement resulted in a contract with
the Rivers Correctional Institution in Winton, North Carolina.
The original contract for this facility called for the

-3-

confinement and management of approximately 1,200 low-security
D.C. inmates.  The Statement of Work for the Rivers facility
allows for the designation to this institution of other low-
security inmates.  The contract was awarded in March 2000, and
the facility opened in March 2001.  Rivers Correctional
Institution began receiving inmates in April 2001.

In February of this year, based partly on tensions between the
criminal aliens and D.C. inmates at the Moshannon Valley
Correctional Center, we transferred all of the D.C. inmates out
of that facility.  The vast majority of these D.C. inmates were
redesignated to Rivers Correctional Institution.

Currently, Rivers Correctional Institution confines approximately
1,300 inmates -- approximately 700 D.C. inmates and approximately
600 criminal aliens.  The Moshannon Valley Correctional Center
now confines approximately 1,500 low-security Federal criminal
aliens.

### Inmate Programs

The mission of the Bureau is to provide safe, secure, humane, and
cost-effective confinement of inmates, and to provide
opportunities for offenders to gain the skills that they will
need to return to society as productive and law-abiding citizens.

-4-

Our programs stress the development of the work skills and life skills needed to enhance employment upon release and to help inmates maintain a crime-free lifestyle.

Our inmate programs include work, education, vocational training, substance abuse treatment, opportunities for religious observance, counseling, and other programs that impart essential life skills and pro-social values.  We also provide a variety of other structured activities that are designed to teach inmates productive ways to use their time.  Preparation for reentry begins in the first days of an inmate's incarceration.  The vast majority of our inmate programs and services are geared toward helping inmates prepare for their eventual release.

The core inmate programs at all BOP facilities include:

- Work Programs -- which includes work in institution jobs and in the Federal Prison Industries Program.
- Education -- including literacy classes (to obtain a General Educational Development certificate), English as a Second Language, adult continuing education, parenting classes, recreation activities, wellness education, and library services.
- Occupational Training
- Vocational Training (VT)

-5-

- Substance Abuse Treatment -- including drug education, nonresidential treatment, residential treatment, and community transition treatment.
- Observance of Faith and Religion
- Psychology Services and Counseling
- Visiting, Telephone, and Correspondence Privileges
- Release Preparation -- which includes institution-based programs and use of residential reentry centers.

In addition, many institutions offer additional pro-social values programs to address a variety of needs among certain segments of the inmate population (including younger offenders and high-security inmates).  These programs focus on inmates' emotional and behavioral responses to difficult situations and emphasize life skills and the development of pro-social values, respect for self and others, responsibility for personal actions, and tolerance.

We also continue the implementation of our Inmate Skills Development initiative.  This is a strategy the BOP has undertaken to unify our inmate programs and services into a comprehensive reentry strategy.  The three principles of the Inmate Skills Development strategy are: (1) inmate participation in programs must be linked to the development of relevant inmate

-6-

reentry skills; (2) inmates should acquire or improve a skill identified through a comprehensive assessment, rather than simply completing a program; and (3) resources are allocated to target inmates with a high risk for reentry failure.

D.C. inmates confined in the Rivers Correctional Institution are offered the opportunity to participate in programs; however, we now believe that the vocational training and residential drug abuse treatment programs are inadequate. We have identified a need to expand vocational training programs, and we intend to enhance and certify the residential substance abuse treatment program so that more low-security D.C. inmates can receive such treatment at a location that is closer to the District.

In November 2006, we evaluated the range of programs at Rivers Correctional Institution and identified a specific need for enhanced vocational training. In December, we asked the GEO Group Inc., the company that operates the facility, to submit proposals to increase programming that these facilities.

We received three proposals from the GEO Group to implement a plumbing vocational training program, a carpentry VT program, and an electrical VT program; and in February 2007 we focused our efforts on these proposals. In March, we sent the three

-7-

proposals to the Court Services and Offender Supervision Agency
(CSOSA) for their review.  CSOSA's review is to help to ensure
the programs will meet appropriate national curriculum standards
and will provide D.C. offenders with marketable skills.  CSOSA
will also help ensure that links to continuing vocational,
apprenticeship, or on-the-job training will be in place for
inmates who do not complete the program during incarceration.

## Residential Drug Abuse Treatment and Reduction in Term of Imprisonment

The BOP has provided some form of substance abuse treatment to
inmates for decades.  The Violent Crime Control and Law
Enforcement Act of 1994 mandates that the BOP provide residential
substance abuse treatment to all eligible prisoners with priority
based on proximity to release date and allows the BOP to reduce
the term of imprisonment for nonviolent offenders who
successfully complete the residential program.

While the statute applies only to inmates convicted in Federal
court, in our effort to treat D.C. Superior Court inmates as much
like Federal inmates as possible, we offer residential drug abuse
treatment to D.C. Superior Court inmates as well.  These
offenders have participated in residential treatment, and they
have been eligible for many of the incentives we offer -- the
exception is the possible reduction in their term of

-8-

imprisonment.  However, changes to that exception are
forthcoming.

On May 24, 2005, the D.C. City Council passed the Omnibus Public
Safety Ex-Offender Sufficiency Reform Amendment Act of 2004.
Among its several provisions, this law allows non-violent, D.C.
Code offenders to receive a reduction of up to 1 year off their
term of imprisonment upon successful completion of the
residential substance abuse treatment program.  We published a
proposed rule to implement this law on November 2, 2006.  We have
composed a final rule and will publish the rule in conjunction
with issuing our own updated policy, which is currently in the
final review and clearance process.

## Conclusion

Mr. Chairman, this concludes my formal statement.  I would be
pleased to answer any questions you or other Members of the
Subcommittee may have.

STATEMENT

OF

PAUL A. QUANDER, JR.,
DIRECTOR,
COURT SERVICES AND OFFENDER SUPERVISION AGENCY
FOR THE DISTRICT OF COLUMBIA

BEFORE THE

UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM
SUBCOMMITTEE ON THE FEDERAL WORKFORCE,
THE POSTAL SERVICE, AND THE DISTRICT OF COLUMBIA

OCTOBER 16, 2007

Chairman Davis, Congressman Marchant, Congresswoman Norton,
and Members of the Subcommittee:

I am pleased to appear before you today. Let me begin by thanking the
subcommittee for this opportunity to discuss the reintegration of men and women
returning to the District of Columbia from prison. As the Director of the federal agency
that supervises approximately 15,200 men and women on community supervision in
Washington, D.C., I know firsthand that the foundation of an individual's successful
reentry can be laid during his or her time in prison. Incarceration provides an opportunity
for the treatment, training, and mental preparation that can determine whether community
supervision is a brief interlude between prison sentences or the beginning of a new way
of life. The National Research Council's Committee on Community Supervision and
Desistance from Crime puts it very succinctly in a new study of parole practices: "[A]

1

EXHIBIT SIX

person should not leave prison without an immediately available...plan for postrelease life."[1]

In 1997, the United States Congress passed legislation transferring responsibility for housing long-term prisoners sentenced under the District of Columbia Code to the Federal Bureau of Prisons (BOP). The transfer was completed in 2000.[2]  Over 6,600 District of Columbia inmates now serve their sentences in BOP facilities around the country.[3]  The largest concentration, about 700 inmates, is housed in a BOP contract facility, the Rivers Correctional Institution in Winton, NC, operated by The GEO Group.

The Court Services and Offender Supervision Agency (CSOSA) was created under the same legislation that transferred D.C. inmates to the BOP, and for much the same reason:  to provide financial relief for the District of Columbia by shifting responsibility for a significant criminal justice function to the federal government.  CSOSA encompasses the D.C. Pretrial Services Agency, as well as the adult probation and parole supervision functions.

Most of the offenders under CSOSA supervision have long histories of substance abuse, educational underachievement, and underemployment.  Their initial risk assessments indicate that 42 percent feel they need substance abuse treatment (and 70 percent have a documented history of drug use); 39 percent are under supervision for drug offenses, and 20 percent have sought substance abuse treatment within the past six months.  Only 56 percent have been employed during the past six months, and only 41 percent possess a GED or high school diploma.

With the resources it has received, CSOSA has improved community supervision by lowering caseloads, implementing stringent contact standards and other close supervision strategies, increasing drug testing, opening multiple field offices and

---

[1] "National Research Council, Committee on Community Supervision and Desistance from Crime. "Parole, Desistance from Crime, and Community Integration." Washington, DC: National Academies Press, 2007. (Advance copy cited.)

[2] A Corrections Information Council (CIC) was established within the D.C. Mayor's Office in FY 2003. The CIC's mission was to "represent the District's interest in the well-being of its prisoners in U.S. Bureau of Prisons facilities." To that end, the CIC proposed conducting regular inspections of BOP facilities housing D.C. inmates. The CIC, which might have played a useful role in monitoring services available to D.C. Code offenders and coordinating post-release services delivery, has not met since February 2005.

[3] As of May 31, 2007, according to the Court Services and Offender Supervision Agency's Office of Research and Evaluation.

automating the case management system. In addition, CSOSA has been resourced to provide substance abuse treatment to a fraction of the offenders that need it and to operate a modest learning and vocational service program that supplements the city's overburdened public treatment and employment services capacity. In 2006, CSOSA opened a Reentry and Sanctions Center to provide intensive assessment and treatment readiness programming to both high-risk offenders entering community supervision and those at risk for revocation due to substance abuse. While CSOSA is still implementing some aspects of its program and only beginning to evaluate others, it is clear that community supervision has been transformed in the District of Columbia.

On any given day, about 5,800 of the men and women under CSOSA's supervision are on parole or supervised release. Upon their return to the community, these individuals choose a path leading either back to criminality or to stability and productivity. Recent research on offender reentry stresses that successful reintegration into society begins during incarceration. As BOP Director Harley G. Lappin stated in March, 2006 testimony before the United States Sentencing Commission:

> ...[R]esearch has demonstrated conclusively that Bureau programs such as Federal Prison Industries, vocational training, education, and residential drug treatment have a positive effect on post-release recidivism. Specifically, these core inmate programs have been proven to substantially reduce recidivism, for as long as 12 years following release from prison....[F]or each dollar spent on inmate programs, taxpayers save substantial amounts of money through lower rates of recidivism: as much as $6.23 for prison industries programs, $7.13 for prison vocational training programs, $5.65 for prison education programs, and even $2.69 for prison drug treatment programs.

Clearly, the BOP recognizes that correctional programs can impact post-release success and provide taxpayer benefits.

In planning how best to improve programs and services available to incarcerated men and women from the District of Columbia, several points need to be considered:

- Resources should be dedicated to relevant educational and vocational training programs at a specific facility, and then D.C. Code offenders should be designated to, or transitioned through, that facility.

3

- Qualified staff must be hired and trained to deliver the programs, and program curricula must conform to BOP standards of quality and comprehensiveness.
- CSOSA should be involved in planning for post-release services, so that programming or treatment begun during incarceration can be continued in the community.

With this in mind, if Rivers is to be the institution housing the most D.C. Code offenders, CSOSA recommends the following program enhancements:

- **Substance Abuse Treatment.** CSOSA defines a clinically appropriate course of treatment as including residential, transitional housing, and outpatient care, often with medical detox services as well. If more returning D.C. offenders completed the BOP's 500-hour residential treatment program, and if completion of the program could coincide with the inmate's release to community supervision, CSOSA could then "pick up" services for most inmates with post-incarceration outpatient treatment and aftercare. For those offenders with the highest risk levels, services could be continued through the Reentry and Sanctions Center.

   This level of coordination is consistent with best practices in reentry programming and addresses the most significant public safety threat posed by offenders in the community. Researchers have established beyond question that drug use and crime are related, and that crime escalates in severity and frequency as drug use increases.[4] To coordinate prison-based and community-based treatment might enable a greater proportion of high-risk offenders to receive effective treatment and reduce the substantial numbers of offenders who are subsequently returned to incarceration due to drug use or drug-related crime. This could have a substantial impact on public safety.

---

[4] See in particular the research of James A. Inciardi of the University of Delaware, who has published extensively on the relationship between drug use and crime since the 1970s.

The BOP treatment model has demonstrated results. The three-year outcome report found that inmates who receive treatment are more likely to avoid new arrest or revocation and maintain employment.[5]

- **Vocational Training.** The Office of the D.C. State Superintendent of Education provides an HVAC training program funded with a Department of Education grant; however, the grant program limits participation to 18- to 24-year-olds. The University of the District of Columbia (UDC) recently launched a pilot program to provide vocational skills assessment and enhancement. Program participants are expected to continue their training at UDC after release. CSOSA worked with both UDC and Rivers to negotiate the Memorandum of Understanding that governs this program. These are very promising programs, but more training opportunities are needed.

While employment is clearly an important part of successful reentry, recent research indicates that getting and keeping a job are complex problems. The Urban Institute's longitudinal study of reentry, *Returning Home*, interviewed 400 Illinois prisoners before and up to three times after their release. The study identified a cluster of issues that had a negative impact on employment: negative peer influences, prior revocations, lack of intimate relationships, drug or alcohol use, and neighborhood drug selling. The ability to maintain employment was related to overall life success and stability. Although most employed respondents were satisfied with their jobs a year after release, their wages averaged only $9.60 per hour.[6]

In order to be as useful as possible to the offender preparing to re-enter the work force, vocational training should be linked to real job opportunities, equip the inmate with skills that are in demand, and incorporate training in techniques the offender can use to combat negative influences, attitudes, and habits. As with substance abuse treatment, the training experience should span the entire reentry experience, beginning in prison and following the offender into the community.

---

[5] Federal Bureau of Prisons. "BOP Triad Drug Treatment Evaluation Three-Year Outcome Report," 2005.
[6] Kachnowski, Vera. "Returning Home Illinois Policy Brief: Employment and Prisoner Reentry." Washington, DC: The Urban Institute, 2005.

CSOSA has been working with the GEO Group and the BOP to develop programs that provide the skills needed in the D.C. job market and to link these programs with local employers and trade unions. Such linkages will provide returning inmates with the opportunity for continued training and, with it, better long-term career prospects. At this time, we are working with the Carpenters Union to develop a union-approved carpentry training program modeled on the recently implemented program at California's Folsom State Prison. As in California, such a program could connect prison-based training with real post-release jobs. We hope this program will be the first of multiple successful efforts to bring vocational training to Rivers.

The Washington, D.C. area economy is primarily knowledge- and information-based. The D.C. Workforce Investment Council reported in 2005 that approximately 70 percent of area employment is in the Business Services sector (which encompasses information systems). Many D.C. offenders possess significant educational deficits; only about half of the offenders under supervision have a high school diploma or GED. However, those that do should have training opportunities in the areas where they are most likely to find a job.

BOP vocational programs range from under 100 hours to thousands of hours in duration and provide credentials ranging from a BOP certificate to Department of Labor-certified "apprentice" status. While it is difficult to define the capacity, duration, and content of programs that should be developed at Rivers, any development effort should take into account the average sentence served by Rivers inmates, which is 60 months. Based on the BOP's March 2005 "Occupational Training Programs Directory," a range of programs, including Business Technology (500 hours), Culinary Arts (1500 hours), and the Computer Technology apprenticeship (4,000 hours) might be considered in addition to an apprenticeship program in the building trades.

The BOP has developed a wide range of programs taught by full-time staff, adjunct instructors under contract, and through cooperative agreements with local colleges and trade schools. Each of these methods of program delivery should be considered for Rivers, which is located in a relatively isolated area.

- **Counseling and Life Skills Programs.** In addition to substance abuse, most inmates face significant behavior-based obstacles to successful reentry. Thirty-seven percent of offenders under CSOSA supervision self-report a mental health issue ranging from recurrent depression and anxiety to a serious personality disorder. In addition, inmates need help preparing for the stresses of reentry. Programs that help offenders manage situational stress and overcome ingrained errors of thinking, understanding, and behavior are just as necessary as job training or GED preparation; a recent Pennsylvania Department of Corrections study cites unrealistic expectations, anti-social attitudes and beliefs, and poor coping skills as the three most important underlying factors of parole violation.[7] Inmates often lack the social and behavioral skills necessary to maintain a job. They may have significant problems with anger, motivation, or communication. The offender is much less likely to succeed upon release if he carries with him the same flawed belief system and coping mechanisms that have served him so poorly in the past.

CSOSA has collaborated with Rivers staff since the summer of 2003 to augment their release preparation program through two video conference programs. The CSOSA/Faith Community Partnership implemented video mentoring to link inmates nearing release from Rivers with faith-based mentors who provide pre-release encouragement and post-release support. We have also developed Community Resource Day, a quarterly video conference to provide inmates nearing release with information from local government and non-profit service providers in the critical areas of housing, health care, education, and employment. Response to these programs has been very positive; however, they are just one element of a comprehensive release preparation program.

The Revitalization Act launched a new era in the administration of justice in Washington, DC. By assuming the cost of housing and post-release supervision for

---

[7] Pennsylvania Department of Corrections, "Research in Review, Special Issue: PA DOC's Parole Violator Study (Phase 2)." Harrisburg, PA: Pennsylvania Department of Corrections, December 2006.

D.C.'s inmate population, Congress also invested in their post-release success. To realize a return on that investment, we must ensure that D.C. inmates have access to the resources they need, both before and after their return to our city. I look forward to continuing to work with the BOP and our other partners to improve the programs available at Rivers and other institutions.